# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

~~**AMERICANS FOR IMMIGRANT JUSTICE**, on
behalf of itself and its clients detained at Krome
North Service Processing Center~~
~~6355 NW 36th St.,~~
~~Virginia Gardens, FL 33166,~~

**FLORENCE IMMIGRANT AND REFUGEE
RIGHTS PROJECT,** on behalf of itself and its
clients detained at Florence Correctional Center
P.O. Box 32670
Phoenix, AZ 85064,

~~**IMMIGRATION JUSTICE CAMPAIGN,** in its
individual capacity and on behalf of detained clients
at Krome North Service Processing Center, Florence
Correctional Center, River Correctional Center, and
Laredo Processing Center~~
~~1331 G St. NW, Suite 200~~
~~Washington, D.C., 20005,~~

~~**IMMIGRATION SERVICES AND LEGAL
ADVOCACY,** on behalf of itself and its clients
detained at River Correctional Center~~
~~3801 Canal St., Suite 210~~
~~New Orleans, LA 70119,~~

~~**REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES,** on
behalf of itself and its clients detained at Laredo
Processing Center~~
~~1305 N. Flores St.~~
~~San Antonio, TX 78212,~~

~~*Plaintiffs*~~
*Plaintiff*,

v.

**U.S. DEPARTMENT OF HOMELAND
SECURITY**
245 Murray Lane, SW
Mail Stop 0485
Washington, D.C. 20528-0485,

**ALEJANDRO N. MAYORKAS**, in his official
capacity as Secretary of the Department of Homeland

No. 1:22-cv-03118 (CKK)

Security,
        2707 Martin Luther King Jr Ave. SE
        Washington, D.C. 20528,

**U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT**
        500 Twelfth St. SW
        Washington, DC 20536,

~~TAE D. JOHNSON~~PATRICK LECHLEITNER,
in his official capacity as Acting Director of U.S.
Immigration and Customs Enforcement
        500 Twelfth St. SW
        Washington, DC 20536,

                        *Defendants*.

~~FIRST~~SECOND **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY
RELIEF**
**(Access to counsel at ICE detention facilities)**

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................... 1

**JURISDICTION AND VENUE** ................................................................... ~~7~~6

**PARTIES** ....................................................................................................... 7

**STATEMENT OF FACTS** .......................................................................... ~~11~~8

**I.**   **THE LEGAL REPRESENTATION PROVIDED BY ~~PLAINTIFFS~~PLAINTIFF IS VITAL TO PEOPLE IN IMMIGRATION DETENTION** ...................................................................................... ~~11~~8

**~~II.~~**   **~~DEFENDANTS HAVE DEVELOPED (BUT FAIL TO MONITOR OR ENFORCE) DETENTION STANDARDS AT THE FOUR DETENTION FACILITIES~~** .................................................................. ~~16~~

   **A.**   **Individual Detained Clients Have Suffered from Attorney Access Barriers.** ................................................................................ **9**

   **B.**   **Plaintiff's Representation of Detained Clients.** ...................... **14**

**~~III.~~II.**   **ACCESS TO COUNSEL AT ~~THE FOUR DETENTION FACILITIES~~FLORENCE IS SEVERELY LIMITED** ...................... ~~18~~20

   A.   Defendants Fail to Ensure Adequate Access to Confidential In-Person Communication Between ~~Plaintiffs~~Plaintiff and Detained Clients. .................................................. ~~19~~21

      ~~i.~~   ~~Defendants fail to provide adequate private spaces for in-person attorney-client meetings.~~ ............................................... ~~19~~

      ~~ii.~~i.   Defendants restrict access to interpreters ~~during in-person visits~~. ..... ~~22~~24

      ~~iii.~~ii.   Defendants impede attorneys' ability to prepare documents and filings during visits. ............................................................. ~~24~~28

      ~~iv.~~   ~~Defendants impose unnecessary barriers to legal visitation, resulting in unreasonable wait times to meet with clients.~~ .................... ~~26~~

   B.   Defendants Restrict Telephone Access ~~between Plaintiffs~~Between Plaintiff and Detained Clients. .................................................. ~~27~~28

      i.   Restrictions on scheduled phone calls at ~~the Four Detention Facilities harm Plaintiffs'~~Florence harm Plaintiff's ability to represent Detained Clients. ................................................................. ~~27~~29

      ii.   Defendants fail to provide private spaces for Detained Clients to make confidential legal phone calls. .............................................. 34

      iii.   Outgoing phone calls from Detained Clients to attorneys are often prohibitively expensive, and ~~the~~ pro bono ~~lines, when available, are~~line is not ~~a~~ viable ~~alternatives~~alternative. ......................... 36

      iv.   Defendants impose time limits and other restrictions that impede clear and effective attorney-client communication by telephone. ......... 38

C.   Defendants Restrict ~~Plaintiffs'~~**Plaintiff's** Ability to Reliably Exchange Legal Correspondence with Detained Clients. .......... ~~40~~**39**

D.   Defendants Deny ~~Plaintiffs~~**Plaintiff** Adequate Access to Confidential Videoconferencing to Communicate with Detained Clients. .......... ~~43~~**41**

E.   Defendants Fail to ~~Make~~**Provide** Reasonable Access to Counsel Accommodations for Detained Clients with Disabilities at Florence ~~and Krome~~. .......... ~~46~~**43**

**~~IV~~III.   DEFENDANTS' RESTRICTIONS ON ACCESS TO COUNSEL AT ~~THE FOUR DETENTION FACILITIES~~FLORENCE HARM ~~PLAINTIFFS~~PLAINTIFF AND DETAINED CLIENTS** .......... ~~55~~**54**

A.   The Restrictions on Attorney-Client Communication Impair ~~Plaintiffs'~~**Plaintiff's** Ability to ~~Effectively Advocate for~~**Provide Effective Legal Representation to** Detained Clients and Harm Detained Clients. .......... ~~55~~**54**

B.   Defendants' Restrictions ~~Impede Plaintiffs' Organizational Missions and Inhibit Their Daily Operations~~**Forces Plaintiff to Use Limited Resources to Counteract the Harm Caused by Defendants' Attorney Access Restrictions**. .......... ~~58~~**56**

**~~V~~IV.   DEFENDANTS HAVE VIOLATED ~~PLAINTIFFS'~~PLAINTIFF'S AND DETAINED CLIENTS' CONSTITUTIONAL AND STATUTORY RIGHTS** .......... ~~61~~**57**

A.   Defendants Are Responsible for Monitoring, Inspection, and Oversight of Conditions at ~~the Four Detention Facilities~~**Florence**. .......... ~~61~~**57**

B.   Defendants Fail to Adequately Manage and Oversee Detention Facilities, Including ~~the Four Detention Facilities~~**Florence**. .......... ~~62~~**59**

**C.   Defendants Can Require Improvements to Attorney Access at Florence Via Contract.** .......... **62**

~~C~~**D.**   Access to Counsel Deficiencies in ICE Detention Facilities Nationwide Demonstrate Defendants' Oversight and Enforcement Failures. .......... ~~67~~**64**

**FIRST CLAIM FOR RELIEF** .......... ~~70~~**68**

**SECOND CLAIM FOR RELIEF** .......... ~~71~~**69**

**~~THIRD CLAIM FOR RELIEF~~** .......... ~~72~~

**~~FOURTH CLAIM FOR RELIEF~~** .......... ~~73~~

**~~FIFTH CLAIM FOR RELIEF~~** .......... ~~74~~

**~~SIXTH CLAIM FOR RELIEF~~** .......... ~~76~~

**PRAYER FOR RELIEF** .......... ~~78~~**70**

## INTRODUCTION

1.      Each day, the U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") lock up thousands of immigrants across the United States in detention centers as they await adjudication of their civil immigration proceedings. Although detention and the outcomes of these proceedings may have life-altering consequences, the federal government does not provide appointed counsel to detained immigrants. Rather, immigrants may be represented by counsel only if they can find and pay for an attorney (from behind bars) or can access pro bono counsel.

2.      The Constitution protects the rights of people in immigration detention to retain, consult with, and access counsel. Defendants, however, have restricted basic modes of communication that are necessary for detained immigrants to consult with counsel, in violation of the Fifth Amendment's Due Process Clause, the First Amendment, and federal law.

3.      Immigration law and proceedings are notoriously complicated. Whether or not people in immigration detention have legal representation is the single most important factor in determining their fate. Detained immigrants who have lawyers are *almost seven times* more likely than those who appear pro se to be released and *ten-and-a-half times* more likely to succeed in their cases.[1] Yet, the majority of detained immigrants are unrepresented in

---

[1] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 9, 70 (2015) (describing different outcomes for represented versus unrepresented non-citizens in removal proceedings between 2007 and 2012); *see also* Jennifer Stave et al., Vera Inst. of Just., *Evaluation of the New York Immigrant Family Unity Project: Assessing the Impact of Legal Representation on Family and Community Unity*, at 60 (Nov. 2017), https://bit.ly/3euAIdD (success rate for indigent immigrant detainees with legal counsel is predicted to be 1,100 percent greater than for pro se detainees in New York City); Emily Ryo, *Detained: A Study of Immigration Bond Hearings*, 50 Law & Soc'y Rev. 117, 119 (2016) (immigrant detainees' likelihood of securing bond is substantially higher when represented by counsel).

1

immigration proceedings, often because they are indigent and cannot afford to hire counsel and/or because many ICE detention facilities are located in remote areas hundreds of miles from the nearest immigration attorneys.[2] That is why ~~Plaintiffs five~~**Plaintiff, the Florence Immigrant and Refugee Rights Project ("FIRRP")—a** non-profit legal ~~organizations dedicate their~~**organization—dedicates its** resources to providing a variety of pro bono legal services to detained immigrants.

4.     Defendants direct, manage, and control the immigration detention system. Defendant DHS and its subagency, Defendant ICE, are authorized to detain individuals who may be ~~eligible for~~**subject to** removal as part of their authority to enforce federal immigration laws. Defendants also contract with local jurisdictions and private prison companies for the use and operation of detention facilities for this purpose. **In these facilities, Defendants set the terms of contract requirements, and are responsible for oversight of detention conditions, including attorney access throughout their detention system nationwide.** Defendants' authority to detain individuals, however, is not absolute; Defendants, like all federal agencies, are bound by the limits of the Constitution and must ensure that their conduct does not infringe upon constitutional and other legal protections.

5.     ~~In at least four immigration detention facilities at which Plaintiffs provide legal services~~   **At** the Florence Correctional Center in Florence, Arizona ("Florence")~~, the Krome North Service Processing Center in Miami, Florida ("Krome"), the Laredo Processing Center in~~

---

[2] *See* Eagly & Shafer, *supra* note 1, at 30 (representation rate of detained non-citizens in removal cases is 14%); ACLU, *Justice-Free Zones: U.S. Immigration Detention Under the Trump Administration*, at 20-21 (2020), https://www.aclu.org/sites/default/files/field_document/justice-free_zones_immigrant_detention _report_aclu_hrw_nijc_0.pdf (the availability of immigration attorneys within 100 miles of new detention centers (post-2017) is among the lowest of all detention facilities nationwide).

~~Laredo, Texas ("Laredo"), and the River Correctional Center in Ferriday, Louisiana ("River")~~ ~~(collectively, the "Four Detention Facilities")~~ **or "FCC"),** Defendants have systematically failed to ensure compliance with constitutional requirements, federal law, and ICE's own policies regarding access to counsel. ~~Plaintiffs bring~~**Plaintiff brings** this action for declaratory and injunctive relief on ~~their~~**its** own behalf and on behalf of clients and prospective clients held at ~~the Four Detention Facilities~~**Florence** ("Detained Clients") because Defendants, through their actions and inactions, have unlawfully prevented reliable, confidential attorney-client communication that is necessary for effective legal representation.

6.     As detailed below, Defendants **have prevented and continue to** prevent attorneys from being able to reliably and confidentially communicate with Detained Clients, both in person and via remote means (*e.g.*, by telephone and videoconference), and in some instances prevent them from being able to communicate with Detained Clients at all. There is ~~often no~~ ~~viable~~**no reasonable** in-person visitation option for attorney-client communication because Defendants fail to provide sufficient meeting spaces~~, or sometimes *any* spaces,~~ in which Detained Clients can communicate confidentially with their attorneys. Defendants ~~restrict~~**have restricted** attorneys from scheduling calls with or leaving confidential messages for Detained Clients. In addition, Defendants fail to ensure the availability of free, confidential outgoing phone calls from detention facilities to attorneys. Defendants also deny access to confidential and quality videoconferencing ("VTC") technology for legal visits and fail to provide a timely and reliable method of exchanging legal documents. Moreover, Defendants deny lawyers the ability to use the tools of their trade, namely ~~laptop computers,~~ printers~~,~~ and cellular telephones, to draft and edit legal documents**, and speak with interpreters** while they are visiting Detained Clients. Defendants also prevent communication between Detained Clients and legal assistants,

interpreters, notaries, medical experts, social workers, and others who have direct functional responsibility for preparation of the client's case ("case-related personnel"). Underscoring the severity of these access limitations, many are *more* restrictive than those for people in criminal custody, even though Detained Clients are being held in civil detention.

7.      The totality of the access-to-counsel failures at ~~the Four Detention Facilities~~**Florence** amounts to a clear violation of ~~both Plaintiffs' and Detained Clients'~~ constitutional and legal rights. These rights are guaranteed by the Fifth ~~and First Amendments~~**Amendment** of the U.S. Constitution. Restrictions that unreasonably limit the ability of Detained Clients to effectively communicate with their lawyers violate their Fifth Amendment due process ~~rights (1)~~**right** to be free from conditions of confinement that amount to punishment~~, and (2) to a full and fair hearing. Undue restrictions on attorney-client communications likewise violate Detained Clients' First Amendment rights to communication and association, as well as Plaintiffs' First Amendment rights~~. Defendants' conduct also violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (the "Rehabilitation Act"), because the barriers to access to counsel more severely impact Detained Clients with **certain specific** disabilities.

8.      The restrictions on access to counsel also violate Defendants' own policies governing conditions of confinement at ICE detention facilities. Defendants have adopted standards that govern conditions in immigration detention, including ~~conditions at the Four Detention Facilities. These standards include~~ the 2008 Performance-Based National Detention Standards ("2008 PBNDS"), ~~the 2011 Performance-Based National Detention Standards (rev. 2016) ("2011 PBNDS"), and the 2019 National Detention Standards ("2019 NDS") (collectively, the "Detention Standards").[3]~~**Enforcement of these standards provides a means by which** [3] ICE, Performance-Based National Detention Standards 2008, https://www.ice.gov/detain/detention-management/2008; ICE, Performance-Based National Detention

~~Defendants can, and purport to, ensure some access to counsel at ICE detention facilities (although the Detention Standards in some instances fall short of constitutional requirements).~~ **which govern conditions at Florence.**[3]

~~9. By adopting the Detention Standards, Defendants have recognized that it is their responsibility to ensure basic access to counsel at ICE detention facilities, including the Four Detention Facilities. However, Defendants fail to monitor or enforce consistent compliance with their own standards and the Constitution. This failure violates the Administrative Procedure Act, 5 U.S.C. § 706.~~

**9.** ~~10.~~ Defendants fail to exercise even the most basic oversight of access to counsel in ICE detention facilities, as illustrated by Defendants' failure to resolve the attorney-access barriers at ~~the Four Detention Centers~~ **Florence**. In a report submitted to Congress ~~this year~~ by ~~Defendant~~ Tae Johnson, ICE's **former** Acting Director, the agency admitted that it "does not track . . . the number of facilities that do not meet ICE standards for attorney/client

---

~~https://www.ice.gov/detain/detention-management/2008; ICE, Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf; ICE, National Detention Standards 2019, https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf. The Four Defendant Detention Facilities are governed by different, but substantially similar, detention standards. Florence is governed by the 2008 PBNDS. Krome and River are governed by the 2011 PBNDS. Laredo is governed by the 2019 NDS. See ICE, ERO Custody Management Division, Authorized Dedicated Facility List, https://www.ice.gov/doclib/facilityInspections/dedicatedNonDedicatedFacilityList.xlsx (Sept. 5, 2022) (specifying standards applicable to each facility).~~

[3] ICE, Performance-Based National Detention Standards 2008, https://www.ice.gov/detain/detention-management/2008. *See* ICE, ERO Custody Management Division, Authorized Dedicated Facility List, https://www.ice.gov/doclib/facilityInspections/dedicatedNonDedicatedFacilityList.xlsx (Sept. 5, 2022) (specifying **applicable standards).**

communications."[4] ICE has further failed to provide adequate oversight of attorney access issues at ~~the Four Detention Facilities~~**Florence**, including during its annual inspections. **In light of these failures, members of Congress have criticized the agency for "ICE's systematic failure to ensure that people in ICE detention have the ability to find and communicate with attorneys."[5]**

**10.** ~~11.~~ Defendants' ~~systemic~~ failure to ensure access to counsel at ~~ICE detention facilities~~**Florence**, in compliance with constitutional and federal law requirements, is ~~illustrated by~~**consistent with the results of** a recent study regarding the denial of access to counsel in immigration detention centers nationwide. The study found that (i) at least fifty-eight ICE detention facilities do not allow attorneys to schedule phone calls with detained clients at a specific date and time when the facility will reliably make the detained client available; (ii) almost half of the facilities that do allow scheduled calls do not honor them consistently; (iii) facilities often arbitrarily deny or delay attorneys' access to their clients for in-person visits, including because the facilities fail to keep track of detained persons; (iv) attorneys often have to conduct legal meetings with clients in public visitation rooms and spaces with no privacy or confidentiality; and (v) detained people and their attorneys have missed filing deadlines because of mail delays and the inability to use fax or email to share documents.~~5~~**6**

---

[4] ICE, *Access to Due Process: Fiscal Year 2021 Report to Congress*, at 2 (Feb. 14, 2022), https://bit.ly/3F1TMek.

**[5] Letter from Members of Congress to A. Mayorkas and T. Johnson, Nov. 3, 2022, https://grijalva.house.gov/wp-content/uploads/2022/11/Access-to-Counsel-for-ICE-detainees-FINAL.pdf.**

~~5~~ **6** ACLU, *No Fighting Chance, ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, at 7-8 (2022), https://bit.ly/3shsrgv.

**11.**   ~~12.~~ Confidential and reliable communication between attorneys and their clients forms the bedrock of the attorney-client relationship. Confidential communication is crucial to discussing sensitive, privileged matters candidly and without concern of waiving the attorney-client privilege or unintentionally disclosing information that may cause clients to suffer harassment, abuse or retaliation while in immigration detention. Moreover, confidential communication is particularly necessary for attorneys to build rapport with detained immigrants, who often exhibit fear and distrust when initially introduced to their own counsel, due to unfamiliarity with the **U.S.** legal process.

**12.**   ~~13.~~ Access to ~~such~~ confidential communication and the ability to exchange legal documents must be regular and reliable enough that attorneys and clients can discuss and prepare factual and legal matters in sufficient detail before relevant deadlines, immigration interviews, and court appearances. This is especially important for fast-paced and time-sensitive proceedings, such as bond and custody hearings and cases concerning conditions of confinement that often address urgent, ongoing injuries to detained immigrants. As a result, without adequate access to counsel, it is no surprise that detained immigrants suffer worse outcomes than those who are fortunate enough to be represented.

**13.**   ~~14.~~ Depriving detained immigrants and their counsel of their rights to confidentially and reliably communicate with each other places detained immigrants' freedom and futures at risk. This Court should order Defendants to comply with the U.S. Constitution~~,~~ **and** federal law~~, and ICE's own Detention Standards~~, and grant the relief requested below and any other relief deemed appropriate by this Court.

7

## JURISDICTION AND VENUE

**14.** ~~15.~~ This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1346 (United States as defendant). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §~~§~~ 702~~, 706~~.

**15.** ~~16.~~ This Court can enter declaratory and injunctive and further necessary or proper relief to recognize and remedy the underlying constitutional and legal violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief)~~, 5 U.S.C. § 706 (agency action),~~ and the Court's inherent equitable powers.

**16.** ~~17.~~ Personal jurisdiction and venue are proper pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies of the United States, or officers of agencies of the United States residing in this District, and a substantial part of the events or omissions giving rise to ~~Plaintiffs'~~ **Plaintiff's** claims occurred in this District. Specifically, Defendants have failed to fulfill their constitutional and statutory duties to ensure that individuals in their custody have adequate access to counsel.

## PARTIES

~~18. Plaintiff Americans for Immigrant Justice ("AIJ") is a 501(c)(3) non-profit organization that (i) advocates for the rights of unaccompanied immigrant children and survivors of trafficking and domestic violence; (ii) serves as a watchdog on immigration detention practices and policies; and (iii) pursues redress on behalf of immigrant groups with particular and compelling claims to justice. AIJ is based in Florida and provides legal services to people detained at Krome, as well as other facilities throughout Florida. AIJ's legal services at Krome include representation in bond and parole proceedings as well as civil litigation challenging inhumane conditions of confinement in immigration detention. AIJ currently represents clients~~

~~detained at Krome who are harmed by Defendants' restrictions on access to counsel, and are otherwise impeded from protecting their own interests regarding attorney access.~~

**17.** ~~19.~~ Plaintiff ~~Florence Immigrant & Refugee Rights Project ("~~FIRRP~~")~~ is a 501(c)(3) non-profit organization that is dedicated to providing free legal and social services to the thousands of people detained in immigration custody at Florence as well as other ICE facilities in Arizona. FIRRP provides legal services, including representation in bond and parole proceedings, complaints to oversight agencies regarding conditions of confinement, and federal court litigation, which includes challenges to conditions of confinement and habeas and mandamus petitions. FIRRP currently represents clients detained at Florence who are harmed by Defendants' restrictions on access to counsel, and are otherwise impeded from protecting their own interests regarding attorney access. **In 2022, FIRRP provided legal services to over 300 people detained at Florence, including direct legal representation to 27 individuals. In at least 20 of those cases, FIRRP represented people in custody proceedings, and helped individuals file** complaints regarding conditions of confinement **to various government oversight agencies in approximately eight of those cases. FIRRP also provided legal representation to at least 10 people** with serious mental health conditions at **Florence in 2022. At this time, FIRRP represents 14 clients at Florence in custody proceedings, and at least two clients in matters related to conditions of confinement. FIRRP currently represents at least seven people** with serious mental health conditions **at Florence, including seven in custody proceedings such as for bond and parole, and at least two in matters related to conditions of confinement. Plaintiff brings this litigation on behalf of Detained Clients at Florence.**

20. Plaintiff Immigration Justice Campaign ("IJC") is a non-profit joint initiative between the American Immigration Council and the American Immigration Lawyers Association. IJC recruits volunteer attorneys to represent pro bono people in immigration detention who are referred to IJC by local immigration legal service providers. IJC provides supervision, training, mentorship, and resources for each case placed with a volunteer attorney. Legal services provided by these attorneys include representation in bond and parole proceedings, and habeas corpus petitions. In the past two years, IJC has served twenty-nine immigration detention centers nationwide, including River, Laredo, Krome, and Florence.[6] IJC supervises volunteer attorneys currently representing clients detained at River, Laredo, Krome, and Florence who are harmed by Defendants' restrictions on access to counsel, and are otherwise impeded from protecting their own interests regarding attorney access.

21. Plaintiff Immigration Services and Legal Advocacy ("ISLA") is a 501(c)(3) non-profit organization that, over the past four years, has focused exclusively on providing pro bono legal services to people in ICE detention in Louisiana. Attorneys at ISLA provide direct legal services to detained people at all ICE detention facilities in Louisiana, including River. These services include representation in proceedings relating to bond and parole, habeas corpus

[6] In contrast to the other plaintiffs, IJC does not maintain a direct attorney-client relationship with its Detained Clients. Rather, it matches third-party volunteer attorneys with detained immigrants in need of pro bono representation. However, as discussed further *infra*, IJC maintains a close relationship with detained clients with whom IJC places pro bono attorneys in the form of continuous, one-on-one mentoring and supervision of the pro bono attorney throughout the engagement with the Detained Client. Furthermore, IJC retains responsibility for the client's case and reserves the right to end the engagement with counsel if the assigned pro bono attorney does not meet IJC's standards. For simplicity, unless indicated otherwise, references herein to Plaintiffs, Plaintiffs' attorneys, or similar references, also refer to the pro bono attorneys IJC matches with Detained Clients and monitors throughout the representation. Likewise, unless indicated otherwise, references herein to Plaintiffs' clients, or Detained Clients, also refer to IJC's detained immigrant clients that IJC matches with pro bono attorneys.

~~petitions in federal court, and administrative~~ complaints ~~regarding conditions of confinement in detention. ISLA also partners with public defenders to provide clients with post-conviction representation in criminal matters. ISLA currently represents clients detained at River who are harmed by Defendants' restrictions on access to counsel, and are otherwise impeded from protecting their own interests regarding attorney access.~~

~~22.   Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a 501(c)(3) non-profit organization based in San Antonio, Texas, that provides free and low cost legal services to underserved immigrant children, families, and refugees, including people in immigration detention. RAICES provides legal services to people in immigration detention facilities across Texas, including Laredo. These services include representation in bond and parole proceedings. RAICES has represented detained clients at Laredo who were harmed by Defendants' restrictions on access to counsel and who are otherwise impeded from protecting their own interests regarding attorney access, but has had to pause intakes of new clients detained at the facility because of Defendants' restrictions on access to counsel. If these restrictions were eased, RAICES would resume taking new cases at the facility.~~

~~23.   Plaintiffs bring this litigation on behalf of themselves and on behalf of Detained Clients at the Four Detention Facilities.~~

**18.**   ~~24.~~ Defendant DHS is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States. DHS is charged with enforcement of Title 8 of the United States Code, under which Detained Clients are purportedly detained. 8 U.S.C. § 1103(a)(1).

**19.**   ~~25.~~ Defendant ICE is a federal law enforcement agency that is a component of DHS. ICE is charged with managing enforcement of immigration laws, including the detention

of immigrants. ICE is responsible for management and oversight of the government's civil immigration detention system and has custody over all Detained Clients at ~~the Four Detention Facilities~~**Florence**.

20. ~~26.~~ Defendant Alejandro Mayorkas is the Secretary of DHS. In this capacity, Mayorkas is ultimately responsible for the actions of ICE. He is the legal custodian of all people detained ~~in the Four Detention Facilities~~**at Florence**. Defendant Mayorkas is sued in his official capacity.

21. ~~27.~~ Defendant ~~Tae Johnson~~**Patrick Lechleitner** is the Acting Director of ICE. In this capacity, ~~Johnson~~**Defendant Lechleitner** is responsible for ICE's policies and practices regarding immigration detention and oversight of the immigration detention system. He is the legal custodian of all ~~people detained in the Four Detention Facilities~~**ICE detainees at Florence**. Defendant ~~Johnson~~**Lechleitner** is sued in his official capacity.

22. ~~28.~~ Together, Defendants are responsible for ~~overseeing~~**the monitoring, inspection and oversight of** ICE's detention facilities, including ~~the Four Detention Facilities~~**at Florence**, and ensuring that those facilities comply with the requirements of the U.S. Constitution, relevant statutes, and ICE's own policies~~, including the Detention Standards~~.

## STATEMENT OF FACTS

I.  **THE LEGAL REPRESENTATION PROVIDED BY ~~PLAINTIFFS~~PLAINTIFF IS VITAL TO PEOPLE IN IMMIGRATION DETENTION**

**23.**  ~~29.~~ From the moment people are brought to an ICE detention facility, their futures depend on successfully deciphering labyrinthine immigration laws and regulations, as well as other laws, policies, and procedures that affect their rights and obligations. Navigating the immigration system and asserting one's civil rights while in ICE detention are extraordinarily difficult. Immigration law is notoriously complex, and in most instances the burden is on detained immigrants to prove that they are entitled to release from custody or to obtain other relief related to their detention. In addition, immigration proceedings, including bond and custody hearings, are generally conducted through an adversarial process between the detained person and DHS attorneys, who are trained in substantive immigration law.

**A.**  **Individual Detained Clients Have Suffered from Attorney Access Barriers.**

**24.**  **"Benjamin" is currently detained at Florence and is a client of FIRRP. FIRRP represents Benjamin in custodial proceedings. The lack of confidential, private means for attorney-client communication at Florence has severely impacted FIRRP's representation of Benjamin. In-person legal visitation is generally not conducted in private spaces at Florence. Florence has one large cafeteria-style visitation room for legal visits. Although people detained in the custody of the U.S. Marshals Service ("USMS") at Florence are not supposed to mix with people detained by ICE, they regularly await legal visits in the same visitation room at the same time.**

**25.**  **Recently, a FIRRP attorney met with Benjamin in the attorney-client meeting room at Florence to prepare a declaration regarding his provision of sensitive information to law enforcement officials regarding cartel operations. This information is**

relevant to his petition for release from custody. However, during the visit, three other men held in USMS custody were brought into the same visitation area. Benjamin terminated the visit with his FIRRP attorney, saying "this isn't good," because he recognized that one of the USMS detainees was watching his legal visit extremely closely. As Benjamin noted, this USMS detainee was "part of [a cartel] organization," had clout, and knew individuals who now wanted him dead. Benjamin expressed fear that the cartel now knew of his whereabouts, and that the cartel knew that he was involved in an immigration case because of his uniform color and because he had been seen meeting with a FIRRP attorney. In a subsequent legal phone visit, Benjamin was not brought to a private space, but instead, to a general visitation area at a table. As a result, the FIRRP attorney had to limit her visit to questions that could only be answered with "yes" or "no" responses, severely impacting the quality of attorney-client communication.

26.    "Santiago" was detained at Florence, and until his deportation in early August 2023, was a prospective FIRRP client. FIRRP had been investigating whether he qualified for their representation services, including representation in custodial proceedings, under the National Qualified Representative Program ("NQRP") due to his mental health conditions. Santiago experiences paranoia and believed that several individuals at the facility were trying to kill him. As a result, he was extremely reticent to speak to FIRRP attorneys about his case in spaces where others could hear him. Because in-person and telephonic legal visits are not typically conducted in private settings, Santiago did not openly communicate with FIRRP staff during legal meetings, making it difficult to conduct a full assessment of his case.

**27.** **"Mugisha" was detained at Florence in early 2023 and is a client of FIRRP. While detained, FIRRP represented Mugisha in his custodial proceedings. Mugisha fled the Rwandan genocide, where most of his family was killed, and was forced into slavery as a child when captured while attempting to escape violence in his village. He has been diagnosed with (i) Post Traumatic Stress Disorder with dissociative symptoms; (ii) Major Depressive Disorder; (iii) Generalized Anxiety Disorder; (iv) Other Specified Disruptive, Impulse-Control, and Conduct Disorder; (v) Alcohol Use Disorder; and (vi) Unspecified Neurocognitive Disorder. He has also been declared incompetent to represent himself in immigration court, due in part to his inability to discuss the persecution that he experienced without severe post-traumatic stress and dissociative symptoms, and is represented by FIRRP under the NQRP.**

**28.** **Mugisha faced significant difficulty in accessing counsel at Florence. Mugisha cannot read or write in any language because he was unable to attend school as a child while enslaved. He speaks Kinyarwanda, French, and Lingala fluently. He was unable to make confidential, private phone calls to his attorneys because there was too much noise and no privacy, calls did not go through, and calls were too expensive. Even when he had money in his account, he could not understand how to use the phone because the directions are not in French. It was difficult to have a private, confidential in-person conversation with his attorney because detained people and their counsel are usually placed in a public room. The noise made it difficult for Mugisha to process what his attorney was saying. It was difficult to have an interpreter because the phone system for in-person visits did not work well. There was no private, free legal VTC at the facility. Mugisha did not understand how the legal mail system works, as no one explained it to him**

in a language that he speaks fluently. Mugisha does not believe that there is any email or fax available to exchange documents with his lawyer. It was difficult for him to begin to trust his attorney and social worker because of the many communication difficulties at Florence. He was unable to share all relevant details or information relevant to his case with his attorney because of the lack of private, confidential attorney-client communication at Florence.

29.     "Jose" was detained at Florence in early 2023 and was a client of FIRRP. Jose has been diagnosed with (i) Post-Traumatic Stress Disorder; (ii) Insomnia Disorder; (iii) Major Depressive Disorder with mood-congruent psychotic features; and (iv) Unspecified Major Neurocognitive Disorder, most likely due to Traumatic Brain Injury. During his detention at Florence, he exhibited behavior including squatting while facing the wall of his cell and rocking back and forth, lying naked in his cell, and rolling balls of feces over the floor. He has been deemed incompetent to represent himself in immigration court, and FIRRP was appointed to represent him under NQRP in custody proceedings.

30.     Jose faced numerous challenges in communicating with FIRRP staff for legal services. For example, at least five times over approximately two months, Florence denied FIRRP staff in-person visitation after they had already traveled to the facility. Attempts to communicate with Jose by telephone also regularly failed while he was placed in mental health observation. During a five-month period in mental health observation, FIRRP staff were only able to communicate with Jose through Florence's call-back message system three times despite numerous attempts. FIRRP attempted to make accommodation requests to ensure attorney-client communication with Jose on various occasions. However,

neither ICE nor facility staff provided the accommodations necessary to ensure access to counsel,

31.     "Pedro" was detained at Florence in early 2023 for over five months, and is a client of FIRRP. While Pedro's symptoms are so extreme that it was difficult to conduct a formal evaluation and obtain a clear diagnosis, medical records from FCC indicate that, at a minimum, he experienced psychosis and suicidality. He had also been observed attempting to self-harm by banging his head and creating a noose from clothing, had been observed apparently responding to internal stimuli speaking to himself, and throwing and smearing feces, and had expressed some bizarre delusions. He has been declared incompetent to represent himself and FIRRP has been appointed to represent him under NQRP.

32.     Pedro faced immense challenges in communicating with FIRRP staff for legal services. In over five months, Florence only permitted FIRRP staff to visit with Pedro in person at Florence on two occasions, with the last successful in-person visit with Pedro at Florence occurring on December 1, 2022. Since initially being referred to Pedro's case for possible bond representation on October 25, 2022, FIRRP staff attempted to conduct in-person visits with him at least 20 times. Fourteen of those attempts were denied by staff. Of the six successful visits FIRRP staff had with Pedro in over five months of detention, four took place at another detention facility: two after an Immigration Court hearing, one as an alternative to FIRRP's request to do a cell-side visit at Florence in the mental health observation area, and one by accident when ICE transported him for court on a day that no hearing was scheduled. FIRRP has never been able to successfully communicate with Pedro via Florence's phone message system, despite several attempts. FIRRP attempted to

17

make numerous accommodation requests to the facility and ICE to ensure attorney-client communication, but none of the accommodations agreed upon by the facility were sufficient to ensure access to counsel.

33.     "Guadalupe" is from Honduras and was recently detained at Florence. She was recently granted protection under the Convention Against Torture ("CAT") based on her identity as a transgender woman. She fears abuse and persecution as a result of her gender identity in Honduras. Guadalupe was detained at Florence between August 11, 2022, and January 19, 2023, even though she prevailed in her CAT case before an Immigration Judge, because ICE refused to release her even after she won her case and DHS had decided to waive appeal as it investigated possible alternative countries for potential removal. FIRRP thus represented Guadalupe in her parole request for release from detention. Guadalupe notes that she received minimal information from ICE about what she needed to ask for release. She also notes that having an attorney helped her better understand her legal options.

34.     While detained at Florence, Guadalupe encountered significant challenges in communicating with FIRRP counsel. As Guadalupe notes, it is impossible to conduct a private, confidential legal call at Florence. The system to make pro bono calls to FIRRP is difficult to use because detained people must be locked down for much of the time when attorneys are available. The attorney message delivery system does not work, as messages were delivered without enough time to make a call as requested, or when she was otherwise not permitted to make a call. Guadalupe notes that it was easier to talk to a lawyer during her incarceration at the neighboring Central Arizona Correctional Facility ("CACF"), a prison also located in Florence, Arizona. At CACF, private legal calls with attorneys could

be scheduled, but it is not possible to schedule such calls at Florence. Because of the lack of privacy in attorney-client communication, Guadalupe could not receive timely updates on her case, and it was difficult for her to provide her counsel with all of the details related to her case.

35.    "Mateo" was detained at Florence from January to October 2022, until his transfer to Larkin Community Hospital. FIRRP was appointed as his counsel under NQRP in February 2022, and has represented him in custody and conditions of confinement proceedings. Mateo remains FIRRP's client. Mateo is diagnosed with schizophrenia and mood disorder, and has been declared incompetent to represent himself in immigration court. Mateo presents with symptoms including auditory hallucination, delusion, and incoherence in his thought process. During his 10-month detention at Florence, Florence only permitted FIRRP to meet with Mateo three times, despite FIRRP's many attempts to meet with him. FIRRP staff left several messages with Mateo requesting that he call them back, and attempted several in-person visits, which facility staff claimed he refused.

B.    Plaintiff's Representation of Detained Clients.

36.    30. Detained people including Detained Clients at the Four Detention Facilities frequentlyFlorence need counsel in various types of proceedings, including, among others, those (i) seeking release from detention through bond, parole, or another custody proceeding, or (ii) challenging conditions of confinement. Plaintiffs devotePlaintiff devotes significant time and resources to preparing Detained Clients for these proceedings and defending Detained Clients' legal rights. Each of these proceedings is explained in further detail in the following paragraphs.

**37.**   ~~31.~~ *Bond and Conditional Parole Proceedings*. After ICE arrests and detains someone, DHS makes an initial custody determination regarding whether the individual should be released on parole, bond, recognizance, or subject to other conditions.[7] DHS may also determine that an individual is subject to mandatory detention and thus ineligible for release on bond, or DHS may exercise its discretion to deny release.[8] Certain immigrants are eligible to seek review of the DHS bond determination at a bond hearing, at which the immigration judge can (i) order release on bond, (ii) order conditional parole, or (iii) deny bond altogether.[9] Conditional parole allows a detained immigrant to be released, without payment of the statutory minimum amount of bond.[10] Detained people typically bear the burden of proving that they should be released on bond or on conditional parole by demonstrating that they (i) do not pose a danger to persons or property, and (ii) are not likely to abscond before their hearings.[11]

**38.**   ~~32.~~ *DHS Parole Proceedings*. Certain noncitizens subject to immigration detention who have not been admitted into the country are eligible for release on parole, which can be authorized by DHS on a case-by-case basis.[12] DHS may exercise its discretion to grant parole to individuals who do not present a security risk nor a risk of flight, and whose release into the country is warranted for "urgent humanitarian reasons or significant public benefit."[13]

---

[7] *See* 8 C.F.R. §§ 236.1(c), 1236.1(c).

[8] *See id.* If DHS determines that an individual is subject to mandatory detention, the detained person may challenge DHS's determination through a Joseph Hearing. *Matter of Joseph*, 22 I. & N. Dec. 660 (BIA 1999).

[9] *See* 8 C.F.R. §§ 1236.1(d)(1), 1003.19.

[10] *See* 8 U.S.C. § 1226(a)(2)(B); *Matter of Castillo-Padilla,* 25 I. & N. Dec. 257, 259 (BIA 2010) (describing conditional parole).

[11] *See Matter of Guerra,* 24 I. & N. Dec. 37, 40 (BIA 2006); 8 C.F.R. § 1236.1(c)(8).

[12] *See* 8 U.S.C. § 1182(d)(5)(A).

[13] *Id.*; 8 C.F.R. § 212.5(b).

20

While parole decisions by DHS are not reviewable by immigration judges, the agency has issued internal guidance on how officers should evaluate requests for parole by certain detained immigrants through an administrative appeals process. As in bond proceedings, noncitizens bear the burden of establishing, to the satisfaction of the adjudicating officer, that they merit release on parole.[14]

**39.** 33. Plaintiffs provide**Plaintiff provides** Detained Clients with representation for these bond and parole proceedings, including at the Four Detention Facilities. Legal representation in these proceedings is critical to the likelihood of a detained immigrant's success. Detained immigrants are approximately seven times more likely to be released when represented by counsel.[15]

**40.** 34. The importance of representation in these proceedings is due in part to the extensive factual record detained immigrants may need to satisfy their burden. In making the determination whether to grant release on bond or conditional parole, immigration judges consider a number of factors, including: (1) whether the person has a fixed address in the United States; (2) how long the person has lived in the United States; (3) whether the person has family ties in the United States, and whether those ties may entitle the person to reside permanently in the country in the future; (4) the person's employment history; (5) the person's record of appearance in court; (6) the person's criminal record, including the extensiveness, recency, and seriousness of any criminal activity; (7) the person's history of immigration violations; (8) any attempts by the person to flee prosecution or otherwise escape from authorities; and (9) the

---

[14] *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 122 (D.D.C. 2018) (citing ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009) ("Parole Directive")).

[15] *See* Eagly & Shafer, *supra* note ~~1~~**1**, at 70.

person's manner of entry to the United States.[16] The specifics or severity of each of these factors may also be considered.[17] DHS considers similar factors in evaluating a request for parole.[18] To prepare an effective request for release on bond or parole, an attorney must gather detailed information and supporting documents about their client's personal and immigration history, and any criminal history (including any mitigating circumstances **or rehabilitation**), as well as information about the merits of any claim to immigration relief and information about the sponsor to whom they will be released. Frequently, this information must be obtained quickly.

**41.    The government has recognized the importance of accessing counsel in custodial proceedings in its regulations,[19] policies,[20] and rulemaking.[21]**

**42.    Congress has similarly recognized the importance of accessing counsel, recently allocating $10 million to DHS "to improve law libraries, update legal materials, provide online legal access, expand video attorney visitation, and facilitate the secure**

---

[16] *Matter of Guerra*, 24 I. & N. Dec. at 40.

[17] *See, e.g.*, *Matter of Andrade*, 19 I. & N. Dec. 488, 490 (BIA 1987) (noting that even though a criminal record per se does not necessitate a high bond amount, the respondent's "extensive and recent" criminal violations "militat[ed] against his release without a significant bond").

[18] *See* Parole Directive, *supra* note 14, ¶ 8.3.

[19] **8 C.F.R. § 1003.17(a) (addressing procedural requirements for attorneys appearing in a "custody or bond proceeding" before an immigration court); *id.* § 1003.16(b) (authorizing respondents in "proceedings before an Immigration Judge" to representation of their choice).**

[20] **Imm. Ct. Practice Manual, § 9.3(e)(2) (last updated June 23, 2023), https://www.justice.gov/eoir/reference-materials/ic/chapter-9/3 ("In a bond hearing, the respondent may be represented by a practitioner of record at no expense to the government.").**

[21] **Separate Representation for Custody and Bond Proceedings, 80 Fed. Reg. 59499, 59501 (Oct. 1, 2015) (codifying 8 C.F.R. 1003) (finding that "increasing the number of individuals who are represented in their custody and bond proceedings" would "increase[e] the efficiency of the Immigration Courts").**

**exchange of legal documents between noncitizens and their counsel" in the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022).[22]**

**43.** 35. Release from detention meaningfully improves an individual's physical and mental health, economic security, ~~ability~~**capacity** to maintain family relationships, and ability to provide care and support to children and other family members. A recent study of the health of detained immigrants concluded that conditions of confinement in ICE detention facilities serve as a catalyst for worsening health, increasing the likelihood of poor general health and of a mental health condition diagnosis in the future.[19][23] The economic impact of detention, especially long-term detention, produces financial insecurity at the individual and household levels, including lost wages and the inability to pay rent, mortgage, and utility bills.[20][24] Detention also has collateral consequences on children and other family members who await their loved one's release: as researchers have documented, detention causes families to experience severe financial hardship, disruption to children's routines and relationships, extreme stress, anxiety, and depression, and declines in school performance.[21][25]

---

[22] **Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023, Division F—Department of Homeland Security Appropriations Act, 2023, 168 Cong. Rec. S8562 (daily ed. Dec. 20, 2022) (statement submitted by Sen. Leahy), https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt2-PgS8553-2.pdf.**

[19][23] Altaf Saadi et al., *Cumulative Risk of Immigration Prison Conditions on Health Outcomes Among Detained Immigrants in California,* J. Racial & Ethnic Health Disparities 1, 5 (Nov. 2, 2021).

[20][24] Caitlin Patler, *The Economic Impacts of Long-Term Immigration Detention in Southern California,* at 2-3, UCLA, Inst. for Rsch. on Lab. & Emp. (2016), https://irle.ucla.edu/old/publications/documents/CaitlinPatlerReport_Full.pdf.

[21][25] Samantha Artiga & Barbara Lyons, *Family Consequences of Detention/Deportation: Effects on Finances, Health, and Well-Being,* Kaiser Fam. Found. (Sept. 18, 2018), https://www.kff.org/racial-equity-and-health-policy/issue-brief/family-consequences-of-detention-deportation-effects-on-finances-health-and-well-being/.

**44.**   36.   *Challenges to Conditions of Confinement.* ~~Plaintiffs assist~~**Plaintiff assists** detained immigrants in challenges to conditions of confinement at ICE detention facilities. Challenges to conditions of confinement—like medical neglect, sexual assault, retaliation, race-based harassment, or use of force—are complex and of great importance to Detained Clients. Such challenges benefit from early intervention by attorneys, and may require extensive fact discovery and support. Detained immigrants challenging conditions of confinement require even greater confidentiality protections in light of potential retaliation by facility staff and Defendants. ~~Plaintiffs assist~~**Plaintiff assists** Detained Clients in filing administrative complaints and lawsuits~~, such as recent~~**. Recent** cases~~, including~~ **include** class action suits~~,~~ filed by ~~AIJ and~~ FIRRP to ensure that ICE implemented COVID-19 protections for detained immigrants ~~at detention centers in Florida, including Krome, and for detained immigrants~~ who are medically vulnerable to the virus at ICE detention centers in Arizona. **Notably, FIRRP brought cases only on behalf of detained clients at the Eloy Detention Center and La Palma Detention Center, but was unable to bring a case on behalf of detained clients at Florence to challenge the lack of COVID-19 protections during the pandemic because of the attorney access barriers at the facility. FIRRP was able to do so at Eloy and La Palma because both facilities allowed them access to schedule phone calls, unlike at Florence.** In order for attorneys to timely respond to urgent conditions-related crises and intervene on behalf of their clients, detained immigrants must have reliable means of communication with their attorneys. Pursuing conditions-of-confinement claims also requires investigating facts, interviewing witnesses, preparing client declarations, appearing in expedited court hearings, reviewing confidential medical records, and significant strategic planning.

**45.** 37. Plaintiffs represent**Plaintiff represents** Detained Clients in legal proceedings such as requests for bond and parole, and conditions of confinement challenges that are procedurally, legally, and factually complex. To navigate them, detained immigrants and their attorneys require, and are entitled to, reliable, private, and regular communication.

**46.** 38. For the same reasons, Detained Clients are hindered from protecting their own interests as first parties in this case. In addition to the attorney access issues discussed here, Detained Clients face significant barriers to bringing such an action on their own, as many. **Many** Detained Clients do not speak English, typically have a limited understanding of the U.S. legal system, have little access to legal resources other than those provided by Plaintiffs, and may fear retaliation if they**Plaintiff, and therefore need access to counsel in order to** bring a federal lawsuit. **Defendants' restrictions on attorney access make it difficult for Plaintiff to represent Detained Clients in their urgent immigration matters, leaving little or no time for Plaintiff to also counsel Detained Clients through first-party federal litigation. In addition, many Detained Clients do not remain at Florence long enough to remain a plaintiff for the duration of a lawsuit. And Detained Clients often fear discussing the details of their confinement with counsel due to fear of retaliation. The inability to conduct confidential phone calls exacerbates that fear.**

**II. DEFENDANTS HAVE DEVELOPED (BUT FAIL TO MONITOR OR ENFORCE) DETENTION STANDARDS AT THE FOUR DETENTION FACILITIES**

39. As the federal agencies and individuals responsible for managing the immigration detention system, Defendants are responsible for ensuring that detained immigrants' access to counsel comports with constitutional and federal law requirements. Even where Defendants contract with local jurisdictions or private prison companies to operate detention facilities—like some of the Four Detention Facilities—Defendants are not absolved from that duty.[22] To the contrary, Defendants must monitor detention facilities to evaluate compliance with constitutional requirements and, when necessary, remedy deficiencies. Defendants' oversight function, which is centralized in Washington, D.C., is discussed further *infra* in Section V.

40. In recognition of their responsibility for management and oversight of immigration detention facilities, Defendants developed certain detention standards that govern conditions in detention facilities. Defendants incorporate certain sets of those standards into contracts with third parties managing detention facilities, including at the Four Detention Facilities.[23] The 2011 PBNDS are applicable to Krome and River. The 2008 PBNDS are applicable to Florence. The 2019 NDS are applicable to Laredo.

41. The Detention Standards govern, among other things, conditions relating to immigrant detainees' ability to access and communicate with their counsel. Although different sets of standards apply to different facilities, the standards are consistent with one another in

---

[22] Krome is directly managed by ICE, although ICE contracts with private prison companies for detention-related services at the facility. ICE operates Florence, Laredo and River through contracts with local jurisdictions or private prison companies.

[23] ICE describes the Detention Standards as requirements, and ICE's contracts reflect that immigration detention facilities are contractually obligated to adhere to the standards. *See, e.g.*, 2011 PBNDS at 5.1, 5.6, 5.7 (uses mandatory language such as "shall" when describing the "expected outcomes" for correspondence and other mail, telephone access and visitation); 2019 NDS at 5.4(II)(J) ("The facility *shall* ensure privacy for detainees' telephone calls regarding legal matters.") (emphasis added).

many respects. For example, all the standards provide that private consultation rooms must be available for legal visits;[24] and that a reasonable number of telephones must be available on which detainees can make calls relating to legal matters without being overheard by officers, staff, or other detainees.[25]

42. As detailed in the following section, the conditions in the Four Detention Facilities fall below the Detention Standards in numerous respects.

43. Although the Detention Standards, if followed, would ensure some minimal degree of access to counsel for detained immigrants, the standards are not in line with constitutional requirements. In many respects, they fall short. To be clear, Defendants must adhere to — and Plaintiffs seek compliance with — the relevant constitutional standards, not only the Detention Standards. Nevertheless, Defendants' failure to monitor or enforce compliance with their own Detention Standards is independently actionable and demonstrates that Defendants acknowledge their responsibility to ensure access to counsel in the ICE detention facilities but simply fail to do so.

**II.    III.    ACCESS   TO   COUNSEL   AT   THE   FOUR   DETENTION FACILITIESFLORENCE IS SEVERELY LIMITED**

**47.** 44. ICE detention facilities across the country currently impose**imposes** alarming restrictions on detained immigrants' ability to access their counsel, including at the Four Detention Facilities **at Florence**. These conditions are not new in the ICE detention system. To the contrary, the rampant, systemwide restrictions on access to counsel at ICE detention facilities

---

[24] 2008 PBNDS at 5.32(V)(J)(9); 2011 PBNDS at 5.7(V)(J)(9); 2019 NDS at 5.5(II)(G)(8).

[25] 2008 PBNDS at 5.31(V)(F)(2); 2011 PBNDS at 5.6(V)(F)(2); 2019 NDS at 5.4(II)(J).

have been well-documented and litigated in recent years. Nonetheless, significant deficiencies persist, including at ~~the Four Detention Facilities~~**Florence**.

**48.** ~~45.~~ As detailed in the following sections, Detained Clients' access to counsel is improperly limited at ~~the Four Detention Facilities in several respects~~**Florence**. *First*, Defendants prevent ~~Plaintiffs~~**Plaintiff** and Detained Clients from meeting confidentially in person because Defendants fail to provide private ~~spaces and other reliable and efficient means for confidential in-person legal visits~~**, confidential attorney-client visitation rooms where counsel can utilize interpretation services and physically pass documents to and from detained clients**. *Second*, Defendants restrict ~~Plaintiffs'~~**Plaintiff's** and Detained Clients' ability to communicate by telephone with each other. *Third*, Defendants restrict ~~Plaintiffs'~~**Plaintiff's** and Detained Clients' ability to reliably exchange legal correspondence. *Fourth*, Defendants deny **the** use ~~or fail to make known the availability~~ of VTC legal visits. *Finally*, Defendants' restrictions on access to counsel pose specific challenges to Detained Clients with disabilities, and Defendants do not ensure that reasonable accommodations are made. These conditions, caused by Defendants' actions and inactions, do not comply with ~~Defendants' own Detention Standards—as indicated within the following sections—let alone~~ the Constitution or federal law.

A. **Defendants Fail to Ensure Adequate Access to Confidential In-Person Communication Between ~~Plaintiffs~~Plaintiff and Detained Clients.**

~~46. Defendants fail to ensure means for reliable and confidential in-person communication between Plaintiffs and Detained Clients. Specifically, Defendants: (i) fail to provide a sufficient number of private rooms (or, in some cases, any private rooms at all) for confidential in-person attorney-client meetings; (ii) fail to accommodate or allow for interpretation services; (iii) impede attorneys' ability to draft documents and filings during in-person meetings; and (iv) impose unreasonable barriers to visitation, including unreasonable~~

scheduling requirements and unreasonable visiting hours for the private rooms that do exist, and unreasonable wait times for legal visits.

i. Defendants fail to provide adequate private spaces for in-person attorney-client meetings.

**49.** 47. Defendants fail to provide a sufficient number of or, at some facilities, *any* private attorney-client visitation rooms to allow detained people to meet confidentially with their attorneys.

48. For example, at River, ISLA attorneys communicate with their clients in an open, heavily trafficked area that serves as a multi-purpose room. During attorney visits, there is a table where the ISLA attorney can meet with a client individually, while ISLA's other clients (who are also scheduled to meet with the attorney that day) are lined up on chairs at the other end of the same room, with guards sitting next to them. Facility guards also go in and out of the room during attorney visits to purchase snacks from the vending machines located in the same room. This open-area meeting space renders confidential attorney-client conversations impossible. In the other, smaller attorney-client visitation space at River, where ISLA attorneys have not met with clients since about a year ago, attorneys and clients are separated by a plexiglass wall. There is a long table built into the wall that looks like a bench with four seats on the attorney and client sides and partial dividers on the client side only. Even with the doors closed in this smaller room, conversations and activities outside the room can be heard.

49. Laredo has only two attorney visitation rooms for a facility with a maximum capacity to detain over 400 people. When RAICES attorneys are able to meet with clients in a visitation room, their conversations often lack the privacy needed for confidential communication. The walls of the two consultation rooms are so thin that sound freely passes between them and the waiting area, which is located immediately outside of the consultation rooms. There is often no

way for RAICES attorneys to communicate with clients without guards, staff, other detained persons, and/or other visitors overhearing their conversations.

50.     Legal visits at Florence occur primarily in a large, cafeteria-style visitation room, which does not provide any confidential space for attorneys and clients to communicate. The room **currently** holds approximately ~~20~~**9** tables, spaced only a few feet apart, where any discussion is within earshot of guards, staff, detained individuals, and other visitors.

51.     Florence has only **two or** three ~~or four~~ private attorney visitation rooms, even though the facility houses ~~up to 450 to 1,000~~**approximately 400** people in ICE detention. The visitation rooms are used by the ~~U.S. Marshals   who~~**USMS   which** also ~~detain~~**detains** people at the facility—which limits their availability for attorney-client meetings. **These visitation rooms are typically not made available for private visitation unless the client in question has been designated a security risk, as most visits are strongly encouraged to take place in the large, cafeteria-style visitation room.** Moreover, when attorneys and clients are actually able to access one of the few private visitation rooms available, attorneys are separated from clients by a plexiglass wall and must speak through a phone. This severely hinders the ability to use an interpreter, share legal documents, and discuss complex legal matters and sensitive facts relating to Detained Clients' legal representation.

~~52.   Krome has only six private in-person contact visitation rooms for a facility with a capacity to hold 682 detained people.~~[26]~~None of these rooms are available for advance scheduling. These private in-person visitation rooms are also used for purposes other than attorney-client visits, including as: (i) waiting rooms for individuals who have a hearing or interview with the~~

---

~~[26]  A "contact" room enables attorneys and clients to communicate without a physical barrier separating them, and is preferred over a "non-contact" room because it permits clear communication and facilitates the exchange of documents.~~

United States Citizenship and Immigration Services ("USCIS") Asylum Office that day; (ii) private rooms for meetings between detained immigrants and ICE Enforcement and Removal Operations ("ERO"); and (iii) rooms for video immigration court proceedings. As a result, the private in-person rooms are often unavailable for confidential attorney-client meetings.

53. Krome also offers 26 no-contact visitation booths. Attorneys and detained persons must communicate across a plexiglass wall with telephones. Conversations in these booths are not confidential or private. The phone lines are recorded and subject to monitoring by ICE. Moreover, there are no enclosures on either side; there is only a plexiglass wall between the attorney and client at each booth. As a result, conversations may be heard by anyone on the same side of the plexiglass wall.

54. Krome offers another no-contact visitation room that further restricts attorney-client communication. In that room, the attorney and client can hear each other clearly only if they place their mouth or ear near a thin metal slot that is only large enough to slide a document through. As a result, the attorney and client cannot make eye contact or interpret each other's facial expressions or body language while speaking or listening. The room also has poor acoustics, making hearing even more difficult. To compound the challenging conditions, because of the room's location, anyone who enters the general visitation area can overhear conversations in the room.

55. The foregoing conditions do not meet requirements under the Detention Standards that: (i) meetings between detained people and attorneys or legal assistants be confidential and

not be subject to auditory supervision,[27] and that (ii) private consultation rooms for such meetings be available.[28]

52.     Benjamin, one of FIRRP's clients currently detained at Florence, has not been able to fully and freely communicate with his FIRRP attorney because his in-person legal visits and telephone calls have not taken place in a private, confidential setting. Benjamin has provided information to law enforcement agencies regarding criminal cartel activity. Because members of the cartel are also held in USMS custody at Florence and can see and overhear Benjamin's conversations with his attorney in the open, cafeteria-style visitation room, not only have Benjamin's attorney visits been cut short, but he is also unable to fully share sensitive information with his attorney out of fear for his own safety in custody.

53.     Similarly, Santiago, a prospective FIRRP client who was detained at Florence, and who FIRRP believes may have a serious mental disability because of his severe paranoia, believed that several individuals at the facility were trying to kill him. As a result, he was extremely reticent to speak to FIRRP staff in any space where others can hear him, including both telephonic and in-person legal visits at Florence, which are not private or confidential. For this reason, FIRRP attorneys faced great difficulty in assessing his case for purposes of evaluating representation.

54.     Mugisha is a FIRRP client who was recently detained at Florence. He reports that it was difficult to have a private, confidential conversation when his lawyer visited in person because their conversations usually took place in a public room. During in-person

---

[27] 2008 PBNDS at 5.32(V)(J)(9); 2011 PBNDS at 5.7(V)(J)(9); 2019 NDS at 5.5(II)(G)(8).
[28] 2008 PBNDS at 5.32(V)(J)(9); 2011 PBNDS at 5.7(V)(J)(9); 2019 NDS at 5.5(II)(G)(8).

legal visits, Mugisha noted that it was noisy and difficult to hear because the room where the visits would occur was located next to a busy hallway where people walked to and from visitation and where guards talked loudly.

55.     Guadalupe is a FIRRP client who was detained at Florence. FIRRP represented Guadalupe in her parole request and custody review process. Guadalupe also described the difficulty in having private, confidential in-person attorney-client conversation because Defendants do not provide a private setting. Instead, Guadalupe reports that conversations were conducted out in the open, where people are so close together that it is possible to overhear other attorneys talking to their clients. This setting made it difficult for Guadalupe to discuss private, sensitive matters with her counsel relating to sexual abuse and harm that she had experienced. Guadalupe reports that she was too nervous and uncomfortable about the fact that people could overhear their conversation and was unable to have a private discussion. Guadalupe notes that she would have been comfortable sharing sensitive information with her attorney if no other people were around, but Florence did not provide that kind of space. Notably, Guadalupe said that the conditions at Florence were worse than those at the neighboring CACF, also located in Florence, Arizona, where Guadalupe served her criminal sentence before her detention by ICE. Guadalupe reports that CACF had spaces dedicated to legal visits.

56.     Although the Court has required that Defendants install six private, confidential attorney-client visitation rooms or telephones that block all others from listening to legal calls in progress at Florence, this has yet to materialize. Order & Preliminary Injunction, ECF No. 78.[26]

---

[26] Defendants have indicated that they intend to install telephone booths at Florence to facilitate virtual legal visits and legal calls, and not confidential attorney-client visitation

**57.** ~~56.~~ The lack of sufficient private attorney-client meeting rooms contrasts with conditions in neighboring jails and prisons. For example, ~~criminal~~**Benjamin notes that when he was in criminal custody, he was able to share sensitive information with his attorney in a private room with a closed door, but he has not felt comfortable doing so in ICE detention at Florence because his conversations usually take place out in the open. Criminal** defense attorneys who make in-person visits to clients at neighboring correctional facilities **also** report availability of private meeting rooms, including for contact visits, where they can conduct confidential visits with clients. These facilities include the ~~Iberia Parish Jail in Iberia Parish, Louisiana; St. Martin Parish Jail in St. Martinsville, Louisiana; the Natchitoches Parish Jail in Natchitoches Parish, Louisiana; Karnes County Correctional Center in Karnes City, Texas; the Miami-Dade Pretrial Detention Center in Miami, Florida; the TGK Correctional Center in Miami, Florida; the Metro West Detention Center in Miami, Florida; and the~~ Central Arizona Detention Center in Florence, Arizona.**[27]**

---

**facilitate virtual legal visits and legal calls, and not confidential attorney-client visitation rooms, in order to comply with the Court's Preliminary Injunction Order. ECF No. 100 ¶ 10.**

**[27]** *See* **Brian D. Bivens and Assocs.,** *Prison Rape Elimination Act (PREA) Audit Report* **3 (2021), https://www.corecivic.com/hubfs/_files/PREA/Facilities/CAFCC%20Final%20Report%20050321.pdf (noting that the Central Arizona Florence Correctional Complex holds BOP inmates).**

              **i.**      ~~ii.~~ Defendants restrict access to interpreters ~~during in-person visits~~.

**58.** ~~57.~~ Interpreters are essential for attorney-client communication when the attorney and client do not speak the same language. ~~Plaintiffs and~~**When a** Detained ~~Clients frequently need interpreters for detained immigrants who do~~**Client does** not speak English~~.~~ **or Spanish, an interpreter is often necessary to ensure that they can speak with their attorney.**

**59.** **Plaintiff has had clients who speak only an indigenous language, such as a Mayan language. The communities that speak these indigenous languages in the United States are generally relatively small. Interpretation is a complex process that requires an understanding of not just the languages involved but also the context in which the interpretation is occurring. For example, an interpreter in an immigration proceeding needs to interpret legal concepts that do not always have a direct translation, like the concept of a determination of credible fear. As a result, the number of qualified interpreters in a particular language is very small. For some of the rarer Mayan and indigenous languages, there may be fewer than a dozen qualified interpreters in the entire United States.**

60.    The small size of the communities that speak indigenous languages also means that the amount of interpretation work available in those languages is small. The large majority of interpreters in those languages cannot rely on interpretation income alone and rely on additional jobs for their primary source of income. For example, Carmelina Cadena, an interpreter who works with FIRRP, has over 20 years of experience as an interpreter and can interpret four different Mayan languages to English, but even she cannot make a living on interpretation alone. She supplements her interpretation income by working as the executive director of an interpretation agency, Maya Interpreters. Even those who are able to work solely as interpreters generally have full-time interpretation jobs (for example, in a hospital in a community with a significant population that speaks a particular indigenous language) and perform legal interpretation as an additional, part-time job.

**61.** **In-person interpretation at ICE detention centers is logistically difficult for interpreters and expensive for Plaintiff, generally costing Plaintiff over $2,000 per interpretation session when factoring in travel costs. Because of the small number of interpreters available, there is rarely an available, qualified interpreter close to Florence. Carmelina reports that she has on multiple occasions traveled to Florence to provide interpretation, even though each of these visits entails a flight followed by a drive of over an hour. In-person interpretation requiring travel can also be impossible for some interpreters, who may not have access to a credit card, may not speak English (instead interpreting from an indigenous language to a Spanish-speaking attorney), or may not be financially able to advance travel costs and wait to be reimbursed by a legal services provider. Additionally, in-person interpretation typically requires advance notice that, in certain circumstances, is not possible for Plaintiff to provide and is often prohibitively expensive for non-profit organizations like FIRRP.**

62.     Contacting an interpreter via phone is often the most practical way to utilize an interpreter's services during an in-person attorney-client visit, especially for languages less commonly spoken in the area near the detention center. **Sometimes it is the only practicable way to obtain an interpreter.** Yet, Defendants prevent interpreters from participating confidentially in attorney-client meetings at ~~Laredo, Krome, and~~ Florence. Specifically, Defendants have blocked **confidential** phone access in visitation ~~rooms at those facilities~~**at Florence**, effectively preventing interpreters from telephonic participation **in any meeting that is actually private and confidential. While the facility has one telephone it allows to be used to contact interpreters in the open visitation room, this fails to provide confidentiality and is insufficient to meet the interpretation needs of the large number of Detained Clients who speak neither English nor Spanish**. Nor are attorneys permitted to bring cellphones into their visits with clients**, which would mitigate the lack of access to phone interpreters**.

**63.     For many languages, phone interpretation sessions must also be scheduled in advance. When an interpretation session is scheduled but the Detained Client is not available during the session, Plaintiff generally incurs charges while the interpreter waits for the Detained Client to join the call. If the Detained Client does not join the call during the window of time that the interpreter scheduled for the call, then the interpreter may be unable to interpret at all for several days.**

**64.     FIRRP relies on the use of interpreters to communicate with clients who speak a language other than English or Spanish, which FIRRP staff are required to speak. Because of Florence's remote location and the lack of interpreters in many languages, especially rare indigenous languages, FIRRP has struggled to identify sufficient interpreters willing and able to provide in-person interpretation at Florence. In recognition**

**of this issue, government contracts for programs such as the Legal Orientation Program and the NQRP pay for and encourage providers to use telephonic interpretation services that they provide, and FIRRP pays for such services for any cases not funded through their government contracts. However, the primary interpreter line often does not provide interpreters for rare or indigenous languages. Moreover, interpretation service agencies, particularly those that provide services for rare and indigenous languages, require advance scheduling for telephonic interpretation. For these reasons, in-person interpretation is not an available alternative for languages other than English or Spanish.**

58. Instead, attorneys at Laredo, Krome, and Florence must arrange to bring an interpreter in person, which is difficult given the remote location of the Detention Facilities and/or the difficulty in obtaining clearance for interpreters. To gain access, those interpreters must be pre-approved by ICE. At Laredo, ICE pre-approval of interpreters can take between *six months and one year*. It is often impossible to find interpreters for less common languages, such as Russian, who are available and willing to travel to rural Laredo, Texas. As a result, RAICES attorneys with clients at Laredo have had to resort, in some instances, to relying on other detained people to help interpret communication with their clients. For example, a RAICES attorney representing a Haitian client in a bond application did not speak Haitian Creole, and so another detainee who spoke Haitian Creole helped translate. This "work-around," however, is problematic. For one thing, a detained person who speaks the same language as the client may not always be available to join the in-person attorney-client meeting or have the requisite fluency of both languages to fully interpret complex conversations. Moreover, involving a third-party in the meeting may jeopardize the attorney-client privilege or otherwise discourage the Detained Client from sharing sensitive or confidential information.

~~59.   At Krome, the pre-approval process for interpreters typically takes two weeks. Although shorter than the time at Laredo, two weeks can be damaging in a fast-moving case. Moreover, an interpreter's approval expires after 90 days, requiring interpreters to regularly re-apply for approval.~~

**65.**   ~~60.~~At Florence, there is one phone available in the visitation area for attorneys who require telephonic interpretation. That one phone is kept at the guard's desk, is not located in a private space, and is only available for use in the public meeting area. Even if telephones or cell phones were permitted inside the few private visitation rooms at Florence—they are not—attorneys and their clients are separated by a plexiglass wall and must speak through a receiver through the wall, rendering telephonic interpretation with an outside interpreter nearly impossible. **Mugisha, one of FIRRP's clients formerly detained at Florence, and who speaks Kinyarwanda, French, and Lingala fluently, noted that it was noisy and difficult to hear. As a result, he remarked that it was difficult to access interpretation for in-person visits because it was difficult to hear the interpreter and the phones had poor sound quality. The situation is even worse in segregation. According to Mugisha, interpretation was more difficult in segregation because it requires passing a cellphone across a glass divider.**

~~61.   The restrictions at Laredo, Krome, and Florence violate the Detention Standards, which require detention facilities overseen by ICE to ensure that detained persons with limited English proficiency have access to interpretation in legal visits, and interpretation services~~

40

necessary for meaningful access to programs and services.[29]Because legal visits must be confidential, interpretation during those visits must also be confidential.

**66.** 62. These restrictions on telephonic interpretation also contrast with conditions at other immigration detention centers that allow the use of phones during in-person visits. As a recent study indicated, at least 37 other ICE detention facilities nationwide currently allow attorneys to use their cellphones in legal visits.[30][28] **These restrictions also contrast with conditions at surrounding jails. Carmelina, the interpreter who works with FIRRP, has also worked with criminal defense lawyers to interpret for their clients held in several jails in Arizona. She reports that, in these jails, criminal defense lawyers are generally able to set up scheduled VTC appointments, where she can provide telephonic interpretation services with the ability to schedule her time in advance and the confidence that the interpretation is likely to take place when it is scheduled to take place.**

> **ii.** iii. Defendants impede attorneys' ability to prepare documents and filings during visits.

63. Attorneys are unable to draft and review documents during in-person meetings with Detained Clients at the Four Detention Facilities. At Krome, Laredo, and River, attorneys are prohibited from bringing laptops and printers into client meetings. Instead, attorneys are only permitted to bring in paper files and a pen or pencil when meeting with clients. As a result,

---

[29] 2008 PBNDS at 5.32(V)(J)(3)(e) ("The facility shall permit interpreters to accompany legal representatives and legal assistants on legal visits . . . ."); 2011 PBNDS at 5.7(II)(10) (requiring communication assistance for detainees with limited English proficiency), 5.7(V)(J)(3)(e) (requiring facility to permit interpreters to accompany legal representatives and legal assistants on legal visits); 2019 NDS at 5.5(II)(G)(3)(e) (requiring facility to permit interpreters to accompany legal representatives and legal assistants on legal visits).

[30][28] ACLU, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, *supra* note 5 6, at 27.

~~attorneys are unable to draft or edit forms, declarations, and other case documents with the assistance of Detained Clients during their in-person visits. This inability to draft, edit, or print documents in real time requires repeated and otherwise unnecessary visits to review and sign documents, a particularly difficult burden at detention facilities that are located a long distance from Plaintiffs.~~

~~64. These restrictions on the use of laptops and printers during in-person attorney visits are in contrast to conditions at neighboring jails, as well as at several other immigration detention facilities. For example, criminal defense attorneys report that they are able to bring in laptop computers to attorney-client visits at facilities including the Iberia Parish Jail in Iberia Parish, Louisiana; St. Martin Parish Jail in St. Martinsville, Louisiana; the Natchitoches Parish Jail in Natchitoches Parish, Louisiana; Karnes County Correctional Center in Karnes City, Texas; the Miami-Dade Pretrial Detention Center in Miami, Florida; the TGK Correctional Center in Miami, Florida; the Metro West Detention Center in Miami, Florida; and the Central Arizona Detention Center in Florence, Arizona. In addition, 98, or over half of, immigration detention facilities nationwide currently allow attorneys to use their laptops in legal visits.[31]~~

**67.** ~~65.~~ Attorneys are also unable to confidentially review and exchange documents with clients in certain visitation rooms at ~~River and Florence. At River, the plexiglass separation between attorneys and clients in the smaller visitation room makes it nearly impossible to review and/or exchange documents during the visit~~ **Florence**. If attorneys elect to use the private meeting rooms at Florence, they cannot exchange documents or procure signatures without giving them to a guard, breaching confidentiality. ~~These restrictions also violate the Detention Standards.[32]~~

---

[31] ~~*Id.*~~

[32] ~~2008 PBNDS at 5.32(V)(J)(10) (requiring that the facility~~ "provide for the exchange of documents between a detainee and the legal representative or assistant, even when contact ~~visitation rooms are unavailable"); 2011 PBNDS at 5.7(V)(J)(10) (same).~~

42

iv. Defendants impose unnecessary barriers to legal visitation, resulting in unreasonable wait times to meet with clients.

66.  Defendants have also erected unreasonable and unnecessary barriers to visitation, causing lengthy wait times and limited windows for legal visits by (i) providing insufficient private meeting spaces for attorney visitation (as discussed above), (ii) requiring attorneys to schedule their in-person visits days, and in some cases, weeks in advance, and (iii) unreasonably restricting visiting hours, including prohibiting visits during evening hours.

67.  As discussed above, the inadequate number of private attorney visitation rooms means that the demand for use of these rooms far outstrips availability, leading to unreasonable and burdensome wait times. In addition, onerous scheduling requirements, ranging from first-come, first-serve policies for use of the limited private rooms (Laredo and Krome), to requirements that appointments be scheduled 24 hours in advance, by at least 3:00 p.m. the day before (River), contribute to lengthy wait times for attorney-client visits. At Laredo, this leads to wait time of over one hour to meet with a client. At Florence, visitation is only permitted between 8:00 a.m. and 4:30 p.m. daily, and FIRRP attorney are not aware of any procedure to schedule visits outside these hours. At River, attorney-client visitation is only permitted during regular business hours (from 8:00 a.m. to :005 p.m.), even though the facility is a three-hour drive each way for ISLA attorneys. Visitation is not permitted in the evening. These limited visitation hours are in contrast to other ICE detention facilities in Louisiana, such as LaSalle ICE Processing Center ("Jena"), which is located in Jena. At Jena, attorney-client visits are permitted between 6:00 a.m. and 11:00 p.m., Monday-Sunday.

68.  These lengthy wait times contrast with conditions in surrounding jails and prisons. For example, criminal defense attorneys with clients at correctional facilities for people in criminal custody report less onerous wait times for legal visits. These facilities include the Iberia

~~Parish Jail in Iberia Parish, Louisiana; St. Martin Parish Jail in St. Martinsville, Louisiana; the Natchitoches Parish Jail in Natchitoches Parish, Louisiana; Miami-Dade Pretrial Detention Center in Miami, Florida; the TGK Correctional Center in Miami, Florida; and the Metro West Detention Center in Miami, Florida.~~

**B.    Defendants Restrict Telephone Access ~~between Plaintiffs~~Between Plaintiff and Detained Clients.**

**68.**    ~~69.~~ Free, confidential telephone access is a critical tool in the representation of detained people, particularly when confidential in-person communication is not easily available. Not only do Defendants fail to ensure reliable in-person communication, but Defendants also unlawfully restrict Detained Clients from making and receiving calls by, among other things: (i) ~~refusing~~**having refused** to allow attorneys to schedule calls with their clients or creating burdensome scheduling requirements, (ii) failing to provide private areas where Detained Clients can make confidential legal phone calls, (iii) charging Detained Clients prohibitively expensive rates to use paid phones to call attorneys and imposing unreasonable restrictions on access to pro bono hotlines, and/or (iv) imposing time limits that impede clear and effective communication.

**69.    On February 1, 2023, the Court entered a Preliminary Injunction Order in this case directing Defendants, within 60 days, to either install six private rooms for confidential attorney-client visitation or to "install[] or transfigure[] a ratio of twenty-five [detainees] to one [telephone] that block all others from listening to legal calls while in progress." Order and Preliminary Injunction, ECF No. 78. The Court ordered Defendants to comply on or before April 3, 2023, and after two extension requests by Defendants, later extended the deadline for compliance to August 23, 2023. Defendants have yet to comply with the Preliminary Injunction Order. On April 11, 2023, in connection with Defendants' first extension request, the Court issued another order issuing interim relief ("Interim**

Order"), instructing Defendants to "acquire and provide under reasonable circumstances a prepaid mobile phone to a FIRRP client upon request for the purposes of attorney-client communications[,]" and to "ensure that the call is made as confidentially as possible under the circumstances." ECF No. 97. The Court instructed that the interim relief must "stand until the installation of the videophone stations [at Florence] or further order of the Court." *Id*. The Court further reminded Defendants that "they are presently holding Plaintiff FIRRP's clients in unconstitutional conditions of confinement and are subject to a preliminary injunction mandating that they remedy these unconstitutional conditions of confinement." *Id*.

70.     Absent the Court's Preliminary Injunction Order and Interim Order, ECF Nos. 78 and 97, the conditions as they existed at Florence at the time of Plaintiff's prior amended complaint with respect to telephone access would not have changed. But for the Preliminary Injunction and Interim Order issued by the Court, Defendants would have continued—and still will continue—to unconstitutionally deny access to counsel to Detained Clients at Florence regarding the provision of telephone access, and will continue to impose barriers to other aspects of access to counsel at Florence, in violation of the Constitution and federal statute.

       i.     Restrictions on scheduled phone calls at ~~the Four Detention Facilities harm Plaintiffs'~~**Florence harm Plaintiff's** ability to represent Detained Clients.

**71.**     ~~70. Plaintiffs'~~**Plaintiff's** ability to schedule phone calls with Detained Clients is essential to legal representation. ~~Despite the critical need for attorneys to be able to schedule confidential calls with their clients, doing so is either impossible or extremely difficult at Florence, Krome, River, and Laredo, harming Plaintiffs and Detained Clients.~~

**72.** 71. At Florence, attorneys have **had** no means to schedule a call with Detained Clients. The**Prior to the Court's April 11, 2023 Interim Order, ECF No. 97, the** only way for **FIRRP** attorneys to communicate with clients**Detained Clients** at Florence over the phone is**has been** to leave a message with the facility in a general voicemail box or to send an email to the facility, at least 24 hours in advance of a desired time for the client to call the attorney from a recorded, public pay phone in the housing unit. This voicemail or email must request that a message be delivered to the client, instructing them to call the attorney at a specified time and date. This message delivery system is unreliable. FIRRP attorneys must often leave several messages over the span of many days before a client returns their call, often not at the requested time. IJC attorneys also report a lack of consistency in message delivery to clients. More often than not, attorney messages are not timely delivered or not delivered to clients at all. This is a violation of the Detention Standard requiring that the facility deliver telephone messages to detained immigrants as promptly as possible.33 29

72. IJC attorneys also report that access to their clients at Florence may depend on whether they speak with a particular guard or facility employee who is willing to help them facilitate a phone call on a given day. The inability to schedule phone calls at Florence forced one IJC attorney to rely on the client's family member for critical information about his client's case. The IJC attorney and his client were only able to have three one-minute phone calls over the course of four weeks. The client had to call from the public payphone in the housing unit, the only method available for people detained at Florence to call their attorneys other than the difficult pro bono line. Because of the short and infrequent phone calls, the IJC attorney had to gather information about the client's case through a family member. This communication led to a

---

33 29 2008 PBNDS at 5.31(V)(J).

~~misunderstanding with the client, who believed that he was going to be released when his state criminal sentence was vacated, when in fact, he was not, and needed to continue working with the IJC attorney on a petition for release. As a result, the client stopped calling the attorney, and was ultimately ordered removed, without having filed a request for release due to difficulties in attorney-client communication.~~

**73.    As FIRRP's clients note, this message delivery system has hampered attorney access at Florence. Mugisha, one of FIRRP's clients formerly detained at Florence, noted that sometimes detained people receive a message from the detention center telling them to call their lawyers, but this system does not really work. Mugisha explains that detained people could not call their lawyers when they get these messages because the phone system is too confusing. Once, Mugisha's attorney left him a message to call back. Mugisha wanted to call his attorney. However, when he tried to talk to ask the staff for help, the housing manager shouted at him. Guadalupe similarly recalls the failure of the message relay system. Guadalupe reports that officers notified her that her attorney has requested that she call him only five minutes before the requested time, which did not work because she had to wait for a phone to become available, or because the call was supposed to happen during count time, when officers would not permit detained people to use the phones.**

**74.** ~~73.~~ In addition, there ~~are~~**have been** no accommodations in place for clients who require an interpreter for legal calls at Florence. **As described above, telephonic interpretation is often the only way in which FIRRP counsel may speak to clients who do not speak either English or Spanish.** Because the telephone system at Florence relies on the clients returning the attorney's call, it is impossible to schedule and secure interpreters when an attorney does not

know when a client will call, particularly in the cases of languages that are less commonly spoken since interpreters must be scheduled well in advance. ~~In another case at Florence, the IJC attorney emailed and called the facility over the course of several days before speaking with a staff member who made an exception and allowed the client to call his attorney at a set time because there was no three-way call capacity on the public phones in the housing unit to accommodate an interpreter, but who made clear that an exception would not be made in the future. However, the attorney was not able to join the Spanish interpreter on a third line and had to rely on her Detained Client's limited English. Since that initial call, the IJC attorney has had limited contact with her client because he was not provided with free legal calls and had to use his own funds to call her.~~

~~74. There is no mechanism for attorneys to~~ set up a telephone call with ~~Detained Clients at Krome. AIJ's attorneys have resorted to sending electronic messages to clients through the GettingOut app, a paid, monitored electronic tablet-based app, instructing clients to call at a designated time from paid phone lines in detention housing units. AIJ's clients, however, are sometimes reluctant to use GettingOut because they lack the funds to pay to receive messages. Moreover, there is no guarantee that the client will call at the requested time, and even then, the clients must call either from monitored, paid phone lines in detention units where conversations are overheard by other detained people and ICE officers, or by using the pro bono hotline, which is similarly located in a public space, and which requires a complex multi-step procedure for which instructions are not readily available near the phones..~~

~~75. Because there is no way to schedule legal calls at Krome, IJC attorneys have resorted to mailing letters to clients and requesting that they call at a designated time. This method is highly unreliable, time-intensive, and depends on a client's literacy. IJC attorneys have also~~

attempted to schedule telephone calls with clients by sending emails, placing phone calls, and leaving voicemails at the facility or with an ICE deportation officer. In one example, an IJC attorney made ten such attempts to reach a client, and never received any response from the facility or ICE officers.

76. There is no reliable way for attorneys to schedule confidential legal calls with clients at River. In theory, River has set up a system to schedule legal phone calls with clients. But information regarding the scheduling system is not publicly available, nor does the system actually function. As recently as August 2022, an IJC attorney attempted to set up a legal call or send a message to a client at River, by calling or emailing the facility six different times, but the facility never responded. As a result, the attorney was forced to contact her client's mother, who in turn gave the client the attorney's phone number, and specified a date and time when the attorney and an interpreter would be available to call from the public payphone in the detention unit. However, because the client did not call at the designated time, no interpreter was present, and the attorney had to depend on another detained person to provide interpretation over the phone. Because it had taken so long to contact the client, the attorney was unable to help the client complete his application for asylum, and was unable to describe the basis for relief from removal in his parole application, which remains pending.

77. Similarly, at Laredo, attorneys have no reliable method to schedule confidential legal calls *in advance*, leaving RAICES with inadequate and unreliable options for attorney-client calls. Detained people may initiate calls to RAICES, by way of a public hotline in the housing unit that is paid for by RAICES. But attorneys cannot schedule calls to take place at a certain time on the free hotline. Attorneys must send several messages for their clients, in the hopes that facility staff will deliver the message to the client and the client will call them. This message

delivery system is unreliable, and, clients have often reported that, despite several messages left by the attorney with the facility, the clients only received one.

78. Information regarding the process for arranging private attorney calls with clients is not publicly available. In addition, the process for arranging private legal calls is neither consistent nor reliable. RAICES attorneys have tried different approaches for arranging private calls, but generally have resorted to contacting a facility employee responsible for setting up private legal visits. This approach is plagued by a host of issues that inhibit effective attorney-client communication. Often, the facility employee does not respond to call requests for days at a time. For example, a RAICES attorney, unable to arrange calls with her client through the facility employee, was forced to track down her client's assigned ICE deportation officer and then repeatedly request that the officer contact the facility employee to arrange a phone call with the client. On another occasion, a RAICES attorney had to leave a message with the facility every hour, for almost five hours, asking to send a request that the client call her back. Because RAICES attorneys have been forced to spend so much time attempting to arrange calls, they have been hampered in their ability to effectively provide legal services to the clients they are seeking to contact, and to other clients at Laredo and elsewhere.

79. Even at the facilities that do have scheduling systems in place, like River, these systems are ineffective. At River, attorneys are required to schedule phone calls in advance; they have no way to speak immediately with their clients on the phone. As a result, ISLA attorneys have sometimes needed to wait more than 32 hours before being able to talk with a client, even if an earlier conversation is required. This situation can make it impossible for ISLA attorneys to promptly communicate with certain clients who have last-minute medical appointments at local hospitals or health clinics, since ISLA is not informed in advance.

~~80.  As a further example, RAICES attorneys have ceased taking clients at another facility, Bluebonnet, in light of arbitrary and time-consuming obstacles to scheduling legal phone calls. At Bluebonnet, attorneys are required to produce a Form G-28 (which purports to demonstrate the official establishment of an attorney-client relationship in immigration cases) signed by the client or potential client before scheduling a legal telephone call, a process which can take up to two weeks. In addition, it typically takes *another* two weeks, from the time of submitting the Form G-28, to schedule a legal call. In at least one instance, a RAICES attorney had to appear at a bond hearing with a client who was unprepared because there was insufficient time for the attorney to confidentially speak with the client prior to the hearing due to restrictions imposed by Defendants.~~

**75.** ~~81.~~ These barriers to telephone communication significantly hinder ~~Plaintiffs'~~ **Plaintiff's** ability to adequately provide legal representation to Detained Clients, particularly in fast-moving situations such as bond hearings.

~~82.  These conditions violate the requirements in the Detention Standards (i) that detainees and their legal counsel shall be able to communicate effectively with each other via telephone and that telephone procedures be designed to foster legal access and confidential communications with attorneys,[34] and (ii) that facilities promptly deliver telephone messages to detainees.[35]~~

---

~~[34] 2008 PBDNS at 5.31(II)(5) ("[t]elephone access procedures will foster legal access"); 2011 PBNDS at 5.6(II)(6) ("[t]elephone access procedures shall foster legal access and confidential communications with attorneys"); 2019 NDS at 5.4(II)(J) ("[t]he facility shall ensure privacy for detainees' telephone calls regarding legal matters").~~
~~[35] 2008 PBDNS at 5.31(V)(J) (requiring message delivery "as promptly as possible" and no less than 3 times a day); 2011 PBNDS at 5.6(V)(J) (delivery of messages "as promptly as possible"); 2019 NDS at 5.4(II)(I) (requiring message delivery normally within 8 waking hours).~~

51

76.     Since the entry of the court's April 11, 2023 Interim Order, ECF No. 97, Defendants have permitted FIRRP attorneys to schedule calls with facility staff to be held on cellular phones. At times, Detained Clients have reported that these cell phone calls do not always occur in confidential locations. For example, Detained Clients have informed FIRRP attorneys that they were given the cell phone in a hallway or in the corner of the cafeteria-style in-person visitation area, where they could be overheard by others. Detained Clients have expressed hesitation to discuss important aspects of their cases regarding sensitive mental health information because they can be overheard. For example, Santiago reported that because a cell phone call he had with a FIRRP attorney took place in an open hallway, where another person was making a call at the same time, he was afraid to share anything too personal. Other times, the cell phone calls are held in the same room as in-person legal visits, where there is no privacy, and it is difficult to hear the other person because it is so noisy in the room. Other Detained Clients, such as Benjamin, fear for their safety when these calls are not held in a confidential location. Benjamin reports that when he has been brought for legal calls with the designated cell phones, facility staff have taken him to the main visitation room instead of a private room, where he must sit at one of the tables in the open area and where many other detained people are holding visits. He reports that, because these tables are out in the open, anyone can overhear conversations. For this reason, he has instructed his FIRRP attorney to ask only "yes" or "no" questions when she is communicating with him over the phone. He has also been hampered in preparing legal documents because he cannot specifically state which documents he needs from his family or attorney, only vaguely describing documents by color, instead of by content. Benjamin's inability to communicate openly and collect necessary documents

delayed his bond hearing, as he could not collect all necessary documents in time, and his attorney had to ask for a continuance.

77.     Prior to the Court's Interim Order, it has been impossible or extremely difficult for attorneys at Florence to schedule confidential calls with their clients, harming Plaintiff and Detained Clients. As described above, despite measures taken to comply with the Interim Order, scheduling confidential calls remains a serious difficulty.

78.     Restrictions against scheduled phone calls at Florence also stand in contrast to scheduled phone call practices at facilities that hold both pre-trial detainees in criminal custody and prisoners serving criminal sentences, as well as other immigration detention centers. Guadalupe, FIRRP's client, can make this direct comparison, as she served a criminal sentence at CACF prior to her detention by ICE at Florence. CACF is part of the same complex as the Florence ICE facility in question in this complaint. Guadalupe reported that she received legal calls while in prison, and that prison officials scheduled the call, made sure that she got the call when it was scheduled, and made sure that she got private space for the call. State prisons nationwide are also required to provide scheduled, confidential legal calls to people serving criminal sentences.[30]

---

[30] Conn. Dep't Corr. Admin. Dir. 10.7 (2022), https://bit.ly/3IQkyI2 (requiring facilities statewide to honor "requests by attorneys . . . for privileged calls . . . at the time specified by the attorney"); Fla. Admin. Code Ann. Rev. 33-602.205 (2022), bit.ly/3Zy9cy3 ("[A]n attorney shall be permitted to request prior arrangements be made with the warden or warden's designee to have an inmate receive a private telephone call from the attorney on an unmonitored telephone[.]"); Idaho Dep't Corr., Stand. Op. Proc. 402.02.01.001 (2019), https://bit.ly/3ISMbjB ("An attorney or attorney's staff member may contact the facility paralegal to arrange a time for the inmate to call the attorney[.]"); Iowa Admin. Code 201-20.4(3)(x), bit.ly/3YyxhUn (last updated Sept. 9, 2021) (detailing protocol for attorneys to schedule unmonitored incoming legal calls); Minn. Dep't Corr., Pol'y 302.210 (2020), https://bit.ly/3xOpl6m ("Attorneys must contact the designated facility staff to schedule a call at a mutually-agreeable date and time."); N.C. Dep't Pub. Safety Prisons, Pol'y and Proc. G.0200 (2022), https://bit.ly/3xPbAEH (allowing attorneys to "make a formal written

**79.** 83. Restrictions against scheduled phone calls at the Four Detention Facilities also stand in contrast to scheduled phone call practices at neighboring jails and other immigration detention centers. For example, scheduled attorney calls are available at correctional facilities such as the Iberia Parish Jail in Iberia Parish, Louisiana; St. Martin Parish Jail in St. Martinsville, Louisiana; the Natchitoches Parish Jail in Natchitoches Parish, Louisiana; and Karnes County Correctional Center in Karnes City, Texas. At Iberia Parish Jail, St. Martin Parish Jail, and Natchitoches Parish Jail, a federal public defender is also able to speak with clients over the phone immediately if needed. Scheduled phone calls are also available at other immigration detention centers. As a recent study found, at least 37 immigration detention facilities nationwide currently allow attorneys to schedule phone calls in advance with their clients,[36][31] and at least seven facilities also permit attorneys to immediately connect with a client over the phone.[37][32]

request to communicate with the offender via telephone"); Or. Dep't Corr., *Professional Visits*, https://bit.ly/3kkkqqU (last visited Mar. 15, 2023) ("Legal telephone calls may be scheduled when a professional visit is not possible."); Pa. Dep't Corr., Pol'y No. DC-ADM 818 (2022), https://bit.ly/3Zlltpi ("[E]ach facility has established phone booths that can be utilized by inmates under certain pre-arranged circumstances . . . at the request of . . . inmates' attorneys[.]"); Tex. Dep't Crim. Just. Board, Pol'y No. BP-03.81 (2021), https://bit.ly/3yamuFf (calls requested by attorneys "can be scheduled on the same day as the request or on a day that is convenient for all parties"); Utah Dep't Corr., *Attorney Information*, https://bit.ly/3Z1755Q (last visited Mar. 15, 2023) ("[A]n attorney of record for an inmate may be able to set up a telephone call with a client," and an "appropriate case manager" will "arrange a call."); Wash. Dep't Corr., *Attorney Communication with Individuals Incarcerated at DOC* (2021), https://bit.ly/3lTNlCj (attorneys may "schedule phone meetings . . . by sending written notice"); *c.f.* Neb. Dep't Corr. Serv., Pol'y 205.03 (2022), https://bit.ly/3YXRJyQ ("As each incarcerated individual has a tablet there is no scheduling need to make phone calls.").

[36][31] ACLU, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, *supra* note 5 6, at 15.

[37][32] *Id.*

**80.**   84. In spite of**Despite** Defendants' actions, it is clear that detention facility staff recognize the efficiency of scheduled attorney calls with people in detention. Earlier this year**In 2022**, facility staff at Florence attempted to set up a system to schedule phone calls in coordination with FIRRP. However, when ICE learned of the proposed plan on a call organized by members of the Arizona Congressional delegation, FIRRP was informed that no new system for scheduling legal calls would take place at the facility.

ii. Defendants fail to provide private spaces for Detained Clients to make confidential legal phone calls.

**81.** 85. Defendants fail to ensure that Detained Clients can make legal phone calls in private areas where their calls cannot be overheard or monitored. Privacy during attorney-client phone calls is paramount to facilitating free and open attorney-client communication—the bedrock of effective representation. Detained Clients often do not feel comfortable sharing sensitive information that may be important for their legal proceedings with their attorneys in the absence of privacy. As a result, Detained Clients and their cases suffer. For example, a volunteer IJC attorney represented a client at River who was forced to make legal calls on a paid line without privacy. Because of the lack of privacy, the IJC attorney believed it was unethical to interview the client about the client's asylum claim and therefore was not able to add any information about the client's asylum claim to the client's parole application.

**82.** 86. Lack of privacy, and clients' resulting hesitance to share information, require FIRRP to spend substantial time conducting in-person follow-up visits to obtain basic case information, and at times, results in FIRRP attorneys operating with incomplete or inaccurate information. At Florence, all calls are made through telephones located in the open housing unit. There is no private place for detained immigrants to communicate confidentially with counsel. **With the exception of the cell phones used in response to the Court's Interim Order (as described above),** Detained Clients must make calls on one of approximately four ~~wall~~ phones **mounted on the wall or in a phone bank**, mounted only two to three feet apart, without any privacy dividers. In addition to the lack of privacy, it is difficult for FIRRP attorneys to hear what Detained Clients are saying because of the background noise generated by other people in the housing area. **Benjamin reports that even when the phones work, there is no privacy: the other phones, tablets, and the microwave are only a few feet away from the phones. Mugisha reports that it was difficult to have a private conversation with his lawyer on these telephones because there is so much noise and no privacy. Mugisha notes that because he could not have a private phone conversation with his lawyer in detention, his case was harmed since there were some information he has never been able to tell his lawyer given the lack of privacy. Guadalupe, another FIRRP client who was detained at Florence, recalls that these phones are not in a private area, and anyone can hear what others are saying. Guadalupe notes that she did not want all the people she was living with to know all of her private affairs and felt embarrassed talking about some aspects of her case without privacy.**

~~87. At Laredo, RAICES staff must often rely on receiving client calls from public phones in the housing units on the RAICES hotline. Calls from the public phones at Laredo are not~~

~~private, and other people in the surrounding area can hear clients on the phone. For example, two RAICES clients, a lesbian couple, had experienced harassment and threats of violence from other detained people at Laredo because of their sexual orientation. Given the public nature of telephone calls, these clients initially did not feel comfortable sharing by phone with RAICES counsel information about their sexual orientation and the resulting harassment they faced. The clients' inability to have a private phone call with RAICES counsel delayed RAICES's understanding of the serious issues facing its clients, its ability to intervene on their behalf, and its eventual request that the facility provide its clients with protection from harassment and threats.~~

~~88. At River, even scheduled legal phone calls are not confidential. These legal phone calls take place at one of many desks in a hallway where guards sit doing work. The officer assigned to the client making the call remains nearby at all times and is able to overhear the client's end of the conversation. Several detained people at River have reported to ISLA attorneys that~~ ~~because of the lack of privacy on telephone calls with counsel, they cannot share sensitive details with their lawyers, causing delays that impede ISLA's ability to represent its clients.~~

~~89. At Krome, the paid phones are located close together and the conversations can easily be overheard by other detained people and guards. The phones are located adjacent to the television and next to the guard's desk, forcing both attorney and client to compete with other distracting noises during calls.~~

**83.** ~~90.~~ At ~~each of the Four Facilities~~ **Florence**, Defendants violate the Detention Standards' requirements that detainees can make calls relating to legal matters without being overheard by officers, other staff, or other detainees.~~38~~33

~~38~~33 2008 PBNDS at 5.31(V)(F)(2) (for legal calls, "each facility shall ensure privacy by providing a reasonable number of telephones on which detainees can make such calls without

**84.** ~~91.~~ Defendants have been able to ensure the provision of private and unmonitored legal calls in other ICE detention facilities. For example, as part of the settlement agreement in *Lyon v. ICE*, No. 3:13-cv-5878 (N.D. Cal.) [ECF No. 280-01], ICE agreed to provide phone rooms consisting of an enclosed space where detained people can make free, direct, unrecorded, and unmonitored legal calls at the West County Detention Facility, Yuba County Jail, Rio Cosumnes Correctional Center, and Mesa Verde Detention Facility, all in California. ICE also installed phone booths in housing units to ensure privacy for legal calls at these facilities.

      iii.    Outgoing phone calls from Detained Clients to attorneys are often prohibitively expensive, and **the** pro bono ~~lines, when available, are~~**line is** not **a** viable ~~alternatives~~**alternative**.

**85.** ~~92.~~ Detained Clients are usually unable to make free outgoing phone calls to their attorneys.

**86.** ~~93.~~ The Executive Office for Immigration Review ("EOIR") and ICE established the EOIR pro bono platform as a system of pro bono telephone lines for detained people to call legal service providers for free. ~~At Krome, clients can only contact their attorneys if they call their attorneys directly on the paid line or if they call the EOIR pro bono phone platform.³⁹ The free hotline is not a viable option for many Detained Clients because of the burdensome process required: the instructions involve five different steps, and these instructions are not publicly posted in the housing pods. These five steps include dialing 1 for English or 2 for Spanish;~~

---

providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees,~~");~~ ~~2011 PBNDS at 5.6(V)(F)(2) (same); 2019 NDS at 5.4(II)(J) (a "facility shall provide a reasonable number of telephones on which detainees can make such calls without being overheard by officers, other staff, or other detainees").~~

~~³⁹ Further, the pro bono line only facilitates calls with a limited group legal service providers, including AIJ. Other pro bono attorneys and legal service providers, such as IJC's volunteer attorneys, cannot access the EOIR Pro Bono Phone line.~~

~~dialing a designated PIN number; dialing 6 to enter the Pro Bono Code system; dialing the appropriate code for AIJ; and then dialing the appropriate extension. Many clients report that it is almost impossible to make calls using the EOIR pro bono platform.~~

**87.** ~~94.~~ At Florence, there are three ways for clients to call attorneys: (i) clients can place the call on a pay phone; (ii) clients can place a collect call, which requires the recipient to have set up a paid account in advance of receiving the call; or (iii) clients can try to make a call on the free pro bono platform. Clients who pay for the calls themselves must pay charges ranging up to $.22 per minute (approximately $20 for a 90-minute phone call), which few clients can afford. Moreover, paid calls and collect calls are monitored and recorded by the facility**, unless the attorney has added that specific number to a list with the phone company**. The free pro bono hotline involves a burdensome registration process where the detained client must enter numerous, lengthy numerical codes perfectly to successfully place a call. Defendants have created unnecessary barriers to accessing the pro bono line by failing to place instructions on entering these codes within reading distance of the phones themselves~~,~~ and**,** where instructions are posted far from the phones, they are incomplete and misleading. The process to access the ~~Florence~~**FIRRP** pro bono phone line is so difficult to navigate that many clients are never able to make a call through it. In addition, Defendants only permit FIRRP to register one telephone number on the pro bono platform at Florence, which leads to a bottleneck of calls from the facility. As a result, FIRRP has sometimes been forced to set up multiple accounts to accept collect calls from Detained Clients**,** at a significant cost. When ~~FIRPP~~**FIRRP** manages to have calls with its clients via the pro bono platform, these calls are often plagued with poor audio quality, random disconnects, and static.

**88.** **For example, Mugisha, a formerly detained FIRRP client at Florence, was unable to make confidential, private phone calls to his attorneys because there is too much noise and no privacy. Calls do not go through on the paid lines. Paid calls are expensive, and even when he had money in his account, Mugisha could not understand how to use the phone because the directions are not in French or any of the other languages he speaks. He did not know how the "free" pro bono line to FIRRP works, and the instructions are not in any language that he speaks. He has never been able to make a legal call using this free line. Likewise, Guadalupe, a FIRRP client formerly held at Florence, recalls that it was difficult to have calls with her lawyer because the calls were so expensive. Guadalupe also notes that the system for the pro bono hotline was also hard to use and took a long time to navigate. By the time she completed navigating through the dial system, she explained that it was someone else's turn to use the phone.**

**89.** ~~95.~~ *Any* charge for telephone use is burdensome for detained people, particularly for indigent clients. And while pro bono telephone lines at ~~Krome and~~ Florence can in theory provide access, they are generally confusing, often to the point where they are unusable.

90.     Separately, the costs of outgoing calls apart from the pro bono ~~lines~~**line** prevent attorneys and Detained Clients from being able to communicate effectively, in violation of the ~~requirements~~**requirement** that each facility provide detainees with direct or free calls to their legal representatives and/or other legal service providers.~~40~~**34**

**91.** ~~96.~~ It is clear that Defendants can ensure the availability of free and private legal phone calls in immigration detention facilities. As part of a settlement agreement in *Lyon*, ICE

---

~~40~~**34** 2008 PBNDS at 5.31(V)(E) (requiring free calls to legal representatives, to obtain legal representation, and to legal service providers listed on the ICE/ERO free legal service provider list)~~; 2011 PBNDS at 5.6(V)(E) (same); 2019 NDS at 5.4(II)(E) (same)~~.

agreed to provide: (i) free unmonitored telephone calls to attorneys providing legal services to people detained at the West County Detention Facility, Yuba County Jail, Rio Cosumnes Correctional Center, and Mesa Verde Detention Facility in California, (ii) accommodations for indigent class members (*e.g.*, allowing extra access to phone rooms or by providing phone credit for housing unit phones), and (iii) on-site facilitators to ensure that detained people have access to legal calls.

>     iv.    Defendants impose time limits and other restrictions that impede clear and effective attorney-client communication by telephone.

**92.**    ~~97.~~ Effective attorney-client communication by telephone is impaired by arbitrary rules and technical failures that cause calls to be inaudible, frequently interrupted, or both. ~~For example, Defendants impose time limits of 10 to 30 minutes on legal calls, which is extremely disruptive to attorney-client communication.~~

~~98. The Laredo facility limits calls on RAICES's free hotline to 15 minutes. This occurs even though RAICES has paid a substantial amount to ensure adequate minutes are provided on the hotline. RAICES pays $4.99 per month for the line, $109.99 per month for the first 5,000 toll-free minutes, and $100.00 per month for each additional 2,565 toll-free minute bundle. Detained Clients are often confused by the frequent cut-offs, and attorneys must spend several minutes at the beginning of the next call explaining the phone system and why the call was cut off, leaving very little of the 15-minute call available for substantive discussions. When a call drops, an automated voice in Spanish and English announces that the call has dropped. Several Haitian Creole-speaking Detained Clients could not understand the message, and thought someone had been listening to their call. In addition, even when Detained Clients understand why the calls are cut off, they are often distracted by the abrupt ending to the call. As a result, clients lose their train of thought and cannot recall what they were about to share because of the~~

interruption, or their attorneys do not hear part of what was relayed, leading to a loss of information and degradation in attorney-client communication. Time limits also make it burdensome to conduct calls with clients who need the aid of an interpreter because the interpreter must wait on hold with a third-party line each time the call drops and then reorient the client when the client calls back.

**93.** 99. At Florence, attorneys' calls to Detained Clients are often cut short or limited (i) because of interference from other jail activities such as count, meals, or recreation hours; (ii) because clients run out of money to pay for the call; (iii) because of high demand from others to use one of the designated phone lines; or (iv) because of instructions from the guards to hang up. **FIRRP staff have experienced calls that disconnect after 15 to 20 minutes for no discernable reason. Benjamin reports that calls often cut out when he is on the phone. As Guadalupe recalls, even though there is a system for free calls to FIRRP, it is often difficult to use because detained people are placed in lockdown without access to phones from 10:00 a.m. to 12:00 p.m., and then again from 2:30 to 4:00 p.m. If an attorney is only available during those times, Detained Clients cannot make calls on their own from the telephones in the unit.**

100. At River, the audio connections on the telephone lines are highly unstable, with static issues sometimes, making it difficult for ISLA attorneys to hear their clients and vice-versa. There have also been occasions when ISLA attorneys' phone calls with clients at River have dropped completely. At Krome, although there are not specific time limits on phone calls, calls can be limited in duration because of interference from other activities in the facility, such as meals or headcount, because of the high demand for the phone lines from other detained people, and/or because of instructions by officers to Detained Clients telling them to end the call.

**94.** ~~101.~~ The Detention Standards require that legal calls not be restricted to less than 20 minutes.[41][35] At other facilities, Defendants have been able to extend or eliminate automatic cut-offs for phone calls placed from detention. For example, as part of the *Lyon* settlement agreement, ICE agreed to extend or eliminate automatic cut-off for phone calls at the West County Detention Facility, Yuba County Jail, Rio Cosumnes Correctional Center, and Mesa Verde Detention Facility in California. ~~ICE also installed phone booths in housing units to ensure privacy for legal calls at these facilities.~~

C.    **Defendants Restrict ~~Plaintiffs'~~Plaintiff's Ability to Reliably Exchange Legal Correspondence with Detained Clients.**

**95.** ~~102.~~ The timely exchange of legal documents with clients is necessary to effective legal representation. In the course of representation, attorneys need to send documents to be reviewed by their detained clients and to obtain signatures on declarations and other legal filings or paperwork. Email and fax are the most efficient means for exchanging documents, especially in fast-paced proceedings and time-sensitive matters. However, these options are generally unavailable at ~~the Four Detention Facilities~~**Florence**, and postal mail is neither quick nor reliable.

**96.** ~~103.~~ Detained Clients are not permitted to exchange documents with counsel via email or fax. ~~Detained Clients at River have access to a paid electronic messaging app called "JailATM," but any messages sent or received on this app are not confidential and are subject to monitoring by the facility and/or the company that owns the app, so the app cannot be used for confidential communications or to exchange legal documents.~~

---

[41][35] 2008 PBNDS at 5.31(V)(F)(1) (specifying that time limits on phone calls be no shorter than 20 minutes)~~; 2011 PBNDS at 5.6(V)(F)(1) (same); 2019 NDS at 5.4(II)(F) (same)~~.

**97.** ~~104.~~ Thus, **FIRRP** attorneys and their clients must rely on mail delivery **or in-person visits** to exchange legal documents. Mail delivery is not dependable and can take lengthy periods of time due to both the remote locations of the ICE detention facilities and delays by Defendants.

**98.** ~~105.~~ At Florence, it routinely takes two or three days for mail to be delivered to Detained Clients, and Detained Clients have faced lengthy delays in their ~~counsels'~~**counsel's** receipt of ~~their~~**Detained Clients'** outgoing mail. FIRRP has represented several clients at Florence who have missed critical filing deadlines or have had to ask for continuances in bond ~~or removal~~ proceedings because of excessive delays in mail leaving the facility, leading to unnecessary and prolonged detention. **As both Mugisha and Guadalupe have observed, there is no fax or email system at Florence for detained people to use. Benjamin reports that it took about two weeks for him to receive documents from his family, and he had a similar experience in receiving documents from FIRRP staff. He reports that this contrasts with his experience in criminal custody, when he received mail only a day or two after it was sent.**

~~106. At Laredo, the facility's internal mail delivery system hinders RAICES's ability to represent Detained Clients. Even documents sent by FedEx take several extra days to reach the client after delivery to the facility. This delay has hindered RAICES's ability to make release requests for clients.~~

~~107. At River, it routinely takes more than a week for mail from ISLA attorneys to reach their Detained Clients. ISLA cannot rely on legal mail for time-sensitive communications or documents that may require a prompt signature to meet a court filing deadline.~~

108. At Krome, mail typically takes one to three days to be received from AIJ's office. And, when mail is received at Krome, the mail is not immediately delivered to Detained Clients, adding a day or more to the time between sending and receiving important legal documents. Krome has no system to allow AIJ to gather signatures from clients without visiting the facility. AIJ cannot rely on legal mail for time-sensitive communications or documents that require a prompt signature. AIJ must resort to FedEx in emergency situations, but it is costly and not sustainable for the non-profit organization. Recently, an IJC attorney with a client at Krome was delayed in obtaining necessary documents for a bond motion because ICE insisted on a signed Form G-28 from the Detained Client, which the Detained Client had to send to the attorney through the mail.

109. Further, mail that is delivered to Detained Clients, including legal mail, is often opened and screened at the Four Detention Facilities before it is distributed. For example, at Laredo, guards open all mail, including mail marked "legal," outside the presence of the detained person, impairing the ability of attorneys to ensure that their communications with clients remain private. This practice violates the Detention Standards.[42] Legal communications sent via fax or email, which do not carry the risk of containing contraband, would not require the same level of scrutiny.

110. Clients at River must pay to send legal mail, with the cost dependent on the weight of the documents being sent. ISLA attorneys have reported that because they cannot count on mail being delivered in less than a week, they must drive to the facility any time they need to have their clients review and sign time-sensitive documents. The lack of a reasonable way to

---

[42] 2008 PBNDS at 5.26(V)(F) (specifying that staff shall neither read nor copy legal mail and shall open and inspect incoming legal mail in the presence of the detainee); 2011 PBNDS at 5.1(V)(F)(2) (same); 2019 NDS at 5.1(II)(E)(2) (same).

~~exchange legal documents limits the number of clients that ISLA attorneys can represent by increasing the time an attorney must spend on each client's case and restricts the quality of their representation because they are unable to move at an expedient pace.~~

**99.**  ~~111.~~ The ability for attorneys to exchange legal documents with their Detained Clients is crucial to effective representation. Defendants' failure to provide ~~Plaintiffs~~**Plaintiff** and Detained Clients with access to email and fax, considering that mail is an insufficient alternative due to cost and delays, means that attorneys run the risk of missing important deadlines for Detained Clients' cases if they use mail or are unable to take on more clients despite their best efforts.

**100.**  ~~112.~~ **State prisons that hold people serving criminal sentences nationwide provide for the exchange of legal documents through fax and email.**[36] Many other immigration detention facilities have made fax machines or email available for attorneys and their detained clients to exchange documents, including the Karnes County Residential Center in Karnes, Texas; South Texas ICE Processing Center in Pearsall, Texas; T. Don Hutto Residential Center in Taylor, Texas; Winn Detention Center in Winnfield, Louisiana; LaSalle Detention Center in Jena, Louisiana; Pine Prairie ICE Processing Center in Pine Prairie, Louisiana; and Stewart Detention Center in Lumpkin, Georgia.

---

[36] **Alaska Dep't Corr., Pol'y and Proc. 810.01 (2020), https://bit.ly/3YmGVZV ("The Department shall implement a system by which attorneys may leave messages for prisoners via facsimile or via e-mail."); Iowa Dep't Corr., Attorney Contact with Incarcerated Clients (last updated Sept. 9, 2021), bit.ly/3YyxhUn (describing "O-mail" electronic mail system); N.J. Inmate Handbook (2014), https://bit.ly/3ZgeuOV (describing guidelines for confidential transmission of faxes between attorneys and clients); Tex. Dep't Crim. Just. Board, Pol'y No. BP-03.81 (2021), https://bit.ly/3yamuFf (attorneys permitted to send incarcerated clients emails through the "official inmate correspondence process").**

**101.    Indeed, in February 2021, ICE issued instructions to detention facilities outlining "best practices" that allow detained people and their counsel to exchange legal documents and obtain signatures via electronic means, including by fax or email.[37] These "best practices" instructed detention facilities to "use dedicated fax line(s), with limited staff access, to help ensure confidentiality of communications," "help ensure that documents are not lost or commingled and are kept private by using envelopes for each detainee," "inspect but . . . not read all incoming and outgoing fax/email documents (consistent with ICE detention standards), "maintain a logbook of faxes received and sent; have detainees sign for incoming faxes when delivered," "institute a maximum 24-hour turnaround time . . . on fax requests or delivery of faxed documents (consistent with ICE detention standards)," "develop a procedure for accommodating urgent requests," and "post the procedures for sending and receiving faxes on the facility page on ICE.gov."[38] As ICE stated, "this method is a best practice consistent with the intent of the ICE detention standards."[39]**

### D.    Defendants Deny ~~Plaintiffs~~Plaintiff Adequate Access to Confidential Videoconferencing to Communicate with Detained Clients.

**102.**    ~~113.~~Defendants deny attorneys and clients adequate access to confidential video teleconferencing ("VTC"). Confidential VTC is essential to attorney-client communication, especially when in-person meetings are not feasible, and because many ICE detention facilities are located in geographically isolated areas that are difficult for attorneys to reach. Face-to-face

---

[37] *Attorney Information and Resources*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/detain/attorney-information-resources, Feb. 2021 (updated Feb. 24, 2023).

[38] *Id.*

[39] *Id.*

communications between attorneys and clients—even if only virtually—are important for building relationships, evaluating the physical, emotional, and mental state of clients, and sharing documents and reviewing visual evidence. It is even more essential ~~in~~to the representation of clients with certain disabilities.

**103.** ~~114.~~ Free, confidential VTC is not available at Florence, ~~Krome, and Laredo, and information about VTC at River is not publicly available or communicated to pro bono attorneys attempting to contact clients, even though it is reportedly provided at 25 other ICE detention facilities, such as the Broward Transitional Center in Pompano Beach, Florida. The fact that other ICE detention facilities are able to provide free, confidential VTC access to facilitate attorney-client communications~~ **even though it is** , and that ICE has made information about VTC access publicly available for at least some facilities on its website,⁴³⁴⁰ demonstrates that it is feasible for Defendants to provide confidential, free, and reliable VTC access to attorneys and their clients at Florence~~, Krome, and Laredo~~.

**104.** **The failure to provide scheduled, confidential, legal VTC calls at Florence for people in ICE custody contrasts with practices at facilities that hold prisoners serving criminal sentences, including for prisoners at the CACF in Florence, Arizona, the same complex as the facility in question here, as well as** other immigration detention centers. For example, **state prisons nationwide are required to provide scheduled, confidential VTC calls to people serving criminal sentences.**⁴¹

---

⁴³⁴⁰ ICE, Virtual Attorney Visitation (last updated Nov. 7, 2022), https://www.ice.gov/detain/attorney-information-resources; ICE, Detention Facilities (last updated ~~June 7~~ **Mar. 15**, ~~2022~~**2023**), https://www.ice.gov/detention-facilities; s*ee also* ACLU, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Facilities*, *supra* note ~~5~~**6**, at 18.

⁴¹ ***See, e.g.***, **Del. Dep't Corr.,** *COVID-19 Frequently Asked Question* **(2020), https://bit.ly/3m09fnz ("The DOC is working to accommodate video meetings for attorneys**

**105.** ~~115.~~ ICE has touted its Virtual Attorney Visitation **("VAV")** program, which enables legal representatives to meet with clients virtually by using video technology in private rooms for remote legal visits. ICE has reported that this legal videoconferencing program is available at 25 detention facilities nationwide.[442] Defendants fail to ensure universal access to confidential VTC despite the fact that VTC is now a ubiquitous, easy, and low-cost way to avoid violating the constitutional rights of detained persons. Indeed, immigration courts in detention facilities routinely conduct court proceedings via VTC, making clear that this technology is clearly available to the government.

---

who prefer to meet with their clients remotely."); Ind. Court Times, *State Public Defender Uses Videoconferencing to Reduce Costs and Improve Services*, Aug. 16, 2011, https://bit.ly/3lTRGp5 (describing installation of confidential VTC for attorney-client communication); Ky. Corr., Pol'y and Proc. 16.5 (2022), https://bit.ly/3m09gYF ("Attorneys of record may use the video visitation system . . . video visits shall not be recorded" and describing scheduling process); Me. Dep't Corr., Pol. No. (AF) 21.04.01 (2022), https://bit.ly/3SJ0OcN (describing protocols for scheduled, privileged video visits); Mass. Dep't Corr., Std. Operating Proc. (SOP) Attorney Video Visits, https://bit.ly/3ECsPNa (last visited Feb. 25, 2022) (establishing guidelines for confidential, scheduled, free attorney video calls); Mich. Dep't Corr., Video Visiting Standards (2021), https://bit.ly/3YZBnWF (describing guidelines for scheduling attorney video calls); N.J. Inmate Handbook (2014), https://bit.ly/3ZgeuOV (describing guidelines for scheduled, confidential attorney videoconference calls); N.D. Dep't Corr. and Rehab., Access to Courts, https://bit.ly/3XYxmQY (last visited Feb. 25, 2023) ("After an attorney and resident complete the required application process, they may communicate through remote video visitation that is not audio-monitored or recorded."); Ohio Dep't of Rehab. & Corr., Information for Attorneys (2022), https://bit.ly/3Zg4iG9 (describing availability of confidential attorney video visits); Pa. Dep't Corr., Pol'y No. DC-ADM 812 (2022), https://bit.ly/3klBnRL (attorney video visits "are not recorded" and "scheduled in advance"); Tenn. Dep't Corr., Index No. 109.09 (2020), https://bit.ly/41D050P ("[A]ttorneys of record requesting videoconferencing with their client shall be provided with the facilities VC contact information.").

[442] ICE, Virtual Attorney Visitation, *supra* note ~~43~~**40**.

**106.** ~~116.~~ At Florence, there is no VTC program for legal visits with detained immigrants, even though these services are made available to individuals held in criminal custody at the same facility.

~~117. Laredo does not offer VTC for attorney-client communication. This prejudices clients significantly. For example, lack of VTC creates an obstacle to robust psychological evaluation. During a psychological evaluation for a RAICES attorney's client via telephone, the psychiatrist expressed that the lack of confidential VTC made it impossible to evaluate the client's body language and facial expressions, which are essential pieces of a psychological evaluation. This undermined the strength of the evaluation.~~

~~118. At Krome, detained people can make video calls on a tablet app, but the service is not confidential or free. Each housing pod, which has beds for approximately 50 detained individuals, is equipped with nine electronic tablets. Each tablet includes the GettingOut app, owned and operated by a private company, which has VTC capabilities. The tablets can be used only in the communal housing pods and cannot be brought into separate rooms or other areas to afford the user confidentiality or privacy. The VTC sessions and messages exchanged on the app are monitored and recorded by guards at Krome.~~

~~119. Private and confidential VTC meetings with attorneys cannot be scheduled at Krome. While an attorney can register their accounts for unmonitored VTC meetings through the "GettingOut" platform, all messages are monitored, and private, confidential VTC calls are impossible. Instead, if an attorney initiates a VTC call via the GettingOut app, all of the tablets in the housing pod will indicate that a VTC call is incoming for a particular detained person. If that detained person is not using the tablet at the time the VTC request comes in, it is up to detainees using the tablets at the time to alert the detained person of the incoming video call. There are~~

three VTC docking stations in each pod that the tablet must be connected to for videoconferencing. Two of the stations are positioned directly underneath a television. These VTC sessions are commonly viewed by other detained people who are watching TV at the time and by officers stationed in the housing pod. The other station is a wheelchair-accessible docking station that is situated lower on the wall, requiring detained people who are not in wheelchairs to sit on the floor or kneel to view the video monitor. The GettingOut app account requires a detained person to pay to initiate VTC calls, but not to receive them.

120. Information about a VTC program at River is not publicly available. This is in contrast to two other ICE detention facilities in Louisiana—LaSalle ICE Processing Center in Jena, Louisiana and Pine Prairie ICE Processing Center in Pine Prairie, Louisiana—where information about legal VTC calls is at least posted on the walls at the facilities. Recently, an IJC volunteer attorney contacted the River facility six times about setting up a legal phone call with her Detained Client, but she was never informed of the facility's VTC program during those attempts to set up a legal call. As a result, the IJC volunteer attorney has not yet been able to conduct a VTC visit at River.

**E.      Defendants Fail to ~~Make~~Provide Reasonable Access to Counsel Accommodations for Detained Clients with Disabilities at Florence ~~and Krome~~.**

**107.**   ~~121.~~ At Florence ~~and Krome~~, FIRRP ~~and AIJ provide~~**provides** legal representation to detained people with serious mental health conditions or mental disabilities who, as a result, are unable to effectively access counsel without reasonable accommodations. These individuals ("Detained Clients with Disabilities") include people who have been determined by a "qualified mental health provider~~,~~" as having a "serious mental disorder or condition." *Franco-Gonzalez v. Holder*, No. 10-02211, 2014 WL 5475097, at *2-3 (C.D. Cal. Oct. 29, 2014).

**108.**   ~~122.~~ "Qualified mental health providers" include "currently and appropriately licensed psychiatrists, physicians, physician assistants, psychologists, clinical social workers, licensed nurse practitioners, and registered nurses." *Id.* at *3.

**109.**   ~~123.~~ A "serious mental disorder or condition" is "a mental disorder that is causing serious limitations in communication, memory or general mental and/or intellectual functioning (*e.g.*, communicating, reasoning, conducting activities of daily living, social skills); or a severe medical condition(s) (*e.g.*, traumatic brain injury or dementia) that is significantly impairing mental function; or [exhibition of] one or more of the following active psychiatric symptoms or behavior: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity[;] . . . significant symptoms of . . . (1) Psychosis or Psychotic Disorder; (2) Bipolar Disorder; (3) Schizophrenia or Schizoaffective Disorder; (4) Major Depressive Disorder with Psychotic Features; (5) Dementia and/or a Neurocognitive Disorder; or (6) Intellectual Development Disorder (moderate, severe, or profound)." *Id*. ~~at *3~~ (defining term for immigrants in detention).

**110.    In 2022, ICE instituted a national directive to all detention facilities regarding the treatment of detained immigrants with serious mental disabilities, including requirements to facilitate attorney-client communication. The directive requires "[f]acilitation of communication" including, "but not limited to," "facilitating the pre-scheduling of attorney of record, legal representative, and/or QR calls at no cost," and "[p]roviding extended time for calls or visitation with the noncitizen's attorney of record."[43] However, as described below, these provisions have not been implemented at Florence.**

111.    ~~124.~~ Detained Clients with Disabilities face even greater obstacles to attorney access than other Detained Clients because they face unique barriers as a result of their disabilities and because they experience even greater challenges resulting from the attorney access impediments at Florence ~~and Krome~~.

[43] U.S. ICE, *ICE Directive 11063.2, Identification, Communication, Recordkeeping, and Safe Release Planning for Detained Individuals with Serious Mental Disorders or Conditions and/or Who Are Determined to Be Incompetent By An Immigration Judge,* Apr. 5, 2022, at 10-11, https://www.ice.gov/doclib/news/releases/2022/11063-2.pdf.

112.    For example, Jose was a FIRRP client who was detained at Florence diagnosed with Post-Traumatic Stress Disorder, Insomnia Disorder, Major Depressive Disorder with mood congruent psychotic features, and Unspecified Major Neurocognitive Disorder, most likely due to Traumatic Brain Injury. During his detention at Florence, he exhibited behavior including squatting while facing the wall of his cell while rocking back and forth, lying naked in his cell, and rolling balls of feces over the floor. He was deemed incompetent to represent himself in immigration court, and FIRRP has been appointed to represent him under NQRP. FIRRP represented Jose in proceedings pertaining to custody and conditions of confinement.

113.    Jose faced numerous challenges in communicating with FIRRP staff for legal services. For example, for at least five times over approximately two months, FCC denied FIRRP staff in-person visitation after they had already traveled to the facility. While he was placed in mental health observation, attempts to communicate with Jose by telephone also regularly failed. During a five-month period in mental health observation, FIRRP staff were only able to communicate with Jose through FCC's call-back system three times despite numerous attempts.

114.   **FIRRP made accommodation requests to ensure attorney-client communication with Jose on various occasions. However, neither ICE nor facility staff provided the accommodations necessary to ensure that Jose has access to counsel. For example, FIRRP routinely requested in meetings with ICE personnel that individuals with known serious mental health conditions like Jose's have access to private, scheduled phone calls facilitated by Florence staff. Notably, one of the few successful calls that FIRRP was able to place with Jose while he was in medical observation took place when a medical staff member assisted him with making a call. This request was repeatedly denied, despite interest in such a system by those charged with telephonic visitation scheduling at Florence. FIRRP staff also sought accommodations for Jose by requesting specific confirmation and approval from ICE for in-person visit requests with Jose. Despite requests for confirmation, FIRRP staff were consistently informed after they arrived to the facility for the in-person visits that Jose would not be brought to visit because he was in medical observation. And, even when ICE specifically approved the visit and cleared it with medical staff ahead of time per the accommodation requests, facility staff often still denied or attempted to deny the visits.**

115.     After nearly two months of failed attempted in-person visits, FIRRP legal staff managed to see Jose in-person only after (1) obtaining specific advance approval for the visit from both of Jose's Deportation Officers, who in turn had the visit pre-cleared with medical staff at Florence, and (2) pushing back firmly with Florence officials' initial attempts to deny the visit despite that authorization. When the visit was eventually allowed, it was conducted in the non-contact attorney-client visitation space where the FIRRP attorney had to communicate through the plexiglass with phones and could not pass any documents or obtain signatures, which was a primary reason for the visit in light of an upcoming bond appeal deadline. A guard remained directly outside the door through the entire visit.

116.     Pedro is another FIRRP client with serious mental conditions formerly detained at Florence. While Pedro's symptoms are so extreme that it was difficult to conduct a formal evaluation and obtain a clear diagnosis, medical records from Florence indicate that, at a minimum, he experienced psychosis and suicidality. He appeared to attempt self-harm by banging his head and creating a noose from clothing, was observed apparently responding to internal stimuli speaking to himself, threw and smeared feces, and had some expression of bizarre delusions. He has been declared incompetent to represent himself, and FIRRP has been appointed to represent him under NQRP.

**117.    Pedro faced immense challenges in communicating with FIRRP staff for legal services. In four months, FIRRP staff were only able to visit with Pedro in person at Florence on two occasions, with the last successful in-person visit with Pedro at Florence occurring on December 1, 2022. Since initially being referred to Pedro's case for possible bond representation on October 25, 2022, FIRRP staff attempted at least twenty times to conduct in-person visits with him. Fourteen of those attempts were denied by staff because Pedro was in mental health observation and either would not or could not come to visitation at FCC or because he likewise refused to attend court or other appointments at the nearby Florence Detention Center, where the Immigration Court is located. Of the six successful visits FIRRP staff had with Pedro, four of those took place at another detention facility, two after an Immigration Court hearing and one as an alternative to FIRRP's request to do a cell-side visit at Florence in the mental health observation area, and one by accident when ICE transported him for court on the wrong day. FIRRP was never able to successfully communicate with Pedro via Florence's phone message system despite several attempts.**

118.    On numerous occasions, FIRRP requested accommodations in order to meet with Pedro. For example, after sending Pedro a message requesting that he call FIRRP staff through the facility message system, FIRRP also requested that staff provide Pedro with assistance and encouragement to make a phone call given the state of his mental health. Although this request was passed on to officers working in the housing unit, FIRRP has still never received a phone call from Pedro. Likewise, FIRRP requested other potential accommodations for in-person visitation with Pedro, including asking visitation officers to go to the housing unit to explain and convince Pedro to attend the legal visit. FIRRP staff later learned that the officers only stated "abogados"—Spanish for "attorneys"—to Pedro, without further explanation. FIRRP staff further sought to have Pedro transferred to the Florence Detention Center, another nearby ICE facility, for legal visits and an expert psychological evaluation necessary for the development of his legal case. However, in all but one instance, even these accommodation requests involving transportation to a different detention center failed. Given the exhaustion of other accommodation attempts, FIRRP requested the ability to visit Pedro in his cell. Based on a conversation with Florence visitation officers, such a request has been granted at least once before. However, FIRRP's request to visit Pedro cell-side was denied. Instead, ICE instructed FIRRP to try to have Pedro transported to the Florence Detention Center again. When that failed, the ICE Assistant Field Officer, Floyd Craig, simply suggested that FIRRP attempt to visit him at Florence again. Despite many attempts, the lack of accommodations prevented FIRRP from being able to communicate with Pedro since the day of his last court date on January 17, 2023, until he was ultimately released from custody.

**119.** ~~125.~~ FIRRP maintains a caseload of approximately one hundred Detained Clients with Disabilities throughout Arizona. In 2021, FIRRP provided representation to 115 detained people with mental disabilities who were deemed incompetent to represent themselves in Arizona. In addition to those individuals, FIRRP also routinely provides legal services, including representation, to approximately two to three Detained Clients with Disabilities per month who have not, or not yet, been found incompetent by an Immigration Court. **More specifically,** FIRRP currently ~~has~~**represents** at least seven Detained Clients with Disabilities at Florence**, including seven in custody proceedings such as for bond and parole, and at least two in matters related to conditions of confinement**. FIRRP's Detained Clients with Disabilities include those who qualify for the ~~National Qualified Representative Program ("~~NQRP~~")~~, which provides free~~,~~ appointed representation to those found by an immigration judge or the Board of Immigration Appeals to be mentally incompetent to represent themselves in court. FIRRP's Detained Clients with Disabilities also include clients who have not yet been deemed eligible for appointed counsel under NQRP, and clients found to be competent but who have serious mental health disorders or conditions that make them unable to effectively access counsel without reasonable accommodations.

~~126. AIJ currently represents four Detained Clients with Disabilities at Krome. AIJ regularly represents Detained Clients with Disabilities who are held in the Krome Behavioral Health Unit ("KBHU"), a unit at Krome specifically designated by ICE for the detention of people with severe mental illness or psychiatric needs from jurisdictions nationwide. AIJ also represents Detained Clients with Disabilities located in other parts of the facility, including the Medical Housing Unit ("MHU"), solitary confinement, and general population units. Detained individuals with serious mental health conditions at Krome regularly solicit legal assistance from~~

~~AIJ. Not all individuals with disabilities who are detained at Krome are provided legal representation through the local NQRP provider, so it is imperative that they can access AIJ's free legal services.~~

**120.**   ~~127.~~ Defendants exclude Detained Clients with Disabilities from~~,~~ **and** deny them the benefit of **access to counsel**, and subject them to discrimination on the basis of **their** disability under a program or activity because Defendants' restrictions on access to counsel specifically inhibit their ability to meaningfully access legal representation. This is because Defendants impose certain barriers disproportionately on Detained Clients with Disabilities and because other barriers that apply both to Detained Clients with Disabilities and other Detained Clients have a disproportionate effect on Detained Clients with Disabilities.

**121.**   ~~128.~~ Detained Clients with Disabilities often require more support and consistent communication to establish **the** rapport **necessary for an effective attorney-client relationship**. Interruptions in communication can undermine the attorney-client relationship and, in some cases, can exacerbate certain mental health symptoms~~, for example~~ (**e.g.**, by contributing to feelings of hopelessness and isolation in clients suffering from major depressive disorders, or by playing into clients' persecutory or delusional beliefs**)**. Additionally, attorneys working with Detained Clients with Disabilities often require more frequent and lengthier conversations to obtain and understand basic facts or convey information effectively to their clients. Generally, the representation of Detained Clients with Disabilities requires more time. For FIRRP, cases that involve Detained Clients with Disabilities can take at least twice and sometimes ~~triple~~**three times** the **amount of** time to prepare **as** compared to other **Detained Clients'** cases, due in large part to **the** barriers **surrounding the necessary accommodations** to access ~~to~~ counsel at Florence.

122.   129. FIRRP's representation of Detained Clients with Disabilities is particularly difficult given that a significant number of these clients also experience suicidal ideation, which often results in placement into medical or mental health observation/segregation — conditions which are akin to solitary confinement at Florence. While on mental health watch, upon information and belief, Florence does not give Detained Clients with Disabilities access to telephones as a safety precaution. If housed in segregated housing outside of the medical unit, Detained Clients with Disabilities may have limited **telephone** access to the telephones, but Florence still does not have a system for attorneys to schedule private legal phone calls, nor does it provide VTC for this population.

123.   130. Florence does not have clearly established procedures that allow**regarding** in-person access to counsel for individuals who are in medical/mental health observation or segregation. Because of this, Detained Clients with Disabilities may experience a total loss of access to counsel for weeks because of prolonged periods in mental health segregation. For example, in one recent case, a FIRRP attorney was denied telephone and in-person visits for nearly a month with a Detained Client with a Disability**disability**, who was under "mental health watch," during which time the client's case continued before the court.

124.   131. FIRRP staff are generally denied any**all** access to their clients or**and** notified that Detained Clients with Disabilities are unavailable for visits because they are in mental health watch. Indeed, even when FIRRP staff schedule an in-person visit a day in advance with a client in medical/mental health watch, Florence typically informs FIRRP staff that they will not bring the client from observation or segregation to the legal visitation area until the attorney arrives at the facility for the legal visit. As such, FIRRP staff have lost countless hours to unnecessary travel and have experienced periods, ranging from days to months, in which FIRRP could not

access its Detained Clients with Disabilities **at Florence** on account of their mental health status ~~at Florence~~.

**125.** ~~132.~~ At Florence, the exclusive reliance on a message relay and call-back system for telephonic communication with clients poses distinct barriers to communicating effectively with Detained Clients with Disabilities, who are ~~particularly~~**especially** unable to navigate the call-back system effectively due to their symptoms or conditions. For example, some Detained Clients with Disabilities lack orientation to place and time, which makes ~~them particularly unable to call~~**calling** their attorneys at a set date and time **particularly difficult** without some facilitation or assistance from staff—which is not provided. Others experience mental health symptoms that impair or interfere with their memory, which again makes an unfacilitated message relay and call-back system—that places the onus of completing the call on the detained individual—ineffective for this **vulnerable** population. Symptoms of delusions and paranoia can cause some Detained Clients with Disabilities to be unwilling to speak about their cases from the housing units, and such clients are often less capable of navigating the already confusing instructions for using the pro bono platform, **as** described above.

**126.** ~~133.~~ Defendants have assured FIRRP that messages requesting call-backs are conveyed to Detained Clients with Disabilities and have stated that these clients are simply refusing to call back, but Defendants rarely provide any specific information about the alleged refusal and they have declined to offer possible accommodations. While instances of Detained Clients failing to call back are not unique to people with mental health conditions, it occurs at a higher rate with Detained Clients with Disabilities. When Detained Clients with Disabilities do call back, FIRRP attorneys report that they hear significant ambient noise in the background, indicating that the calls are not being placed from a sufficiently private location.

**127.** ~~134.~~ Detained Clients with Disabilities **at Florence** need other accommodations to effectively communicate with attorneys. Such accommodations include clearly established procedures for attorneys to visit with clients in medical, isolation, or segregation units, contact or video visits where clients can communicate with attorneys face-to-face, as well as additional time to communicate given mental disabilities. The lack of confidential in-person and VTC access especially harms Detained Clients with Disabilities because their disabilities often make it essential for them to be able to visually see their attorneys when communicating and make it helpful for their attorneys to be able to see them. Without confidential in-person or VTC meetings, clients with serious mental health conditions often cannot meaningfully communicate with counsel.

**128.** ~~135.~~ Even though FIRRP has requested accommodations—such as permission to see Detained Clients **with Disabilities** in the medical unit, facility transfers, or scheduled and facilitated phone calls—Florence generally does not provide these accommodations. When FIRRP attorneys ~~bring up~~**mention** requests for accommodations, facility staff often appear to lack knowledge or awareness of what responsibilities they ~~may~~ have to accommodate detained people with disabilities. In some cases, FIRRP has also sought ~~accommodation~~**accommodations** directly from ICE officers. For example, FIRRP requested that a Detained Client with a Disability be transferred to another facility with fewer access issues, or even transported for the day to the facility where the immigration court is held because the FIRRP attorney had more success speaking to the client in that facility. However, those requests were unsuccessful. In a recent case, it took nearly a month of advocacy and visitation attempts before FIRRP was able to meet with a client on mental health watch. The attorney on this case had to obtain separate

approval from ICE to meet with her client, outside of the normal visitation scheduling process, and even then, had to push Florence staff to actually bring her client to visitation.

136. Detained Clients with Disabilities at Krome also require, but have not received, accommodations necessary to ensure attorney access. Impediments to access to counsel at Krome include a lack of VTC calls, a lack of scheduled and confidential legal calls, and communication restrictions in solitary confinement, all of which pose particularly heightened challenges for Detained Clients with Disabilities at Krome.

137. Cases involving Detained Clients with Disabilities have a greater need for face-to-face meetings, either via VTC or in person, to establish rapport, fully assess mental status, and identify specific accommodations required. The lack of VTC visits at Krome poses particular challenges to Detained Clients with Disabilities, as attorneys lack this important method of communication to establish rapport, build trust, and assess the mental state of clients.

138. The inability to schedule and have confidential legal VTC or telephone calls at Krome also poses heightened difficulty for Detained Clients with Disabilities. Individuals suffering from conditions such as paranoia and psychosis may have even greater difficulty speaking about traumatic or sensitive issues in front of guards and other detained individuals, making it excessively difficult for these individuals to communicate with counsel via the telephone at Krome. For example, AIJ recently had a prospective client with a serious mental condition which rendered him so distrustful of the telephones at Krome and whether the calls were monitored or recorded, that he was unable to speak with attorneys and AIJ was unable to proceed with his consultation and legal representation.

139. AIJ also receives calls from prospective clients with serious mental health conditions who seek assistance addressing abusive conditions of confinement, but who are

unable to share details of their complaints over the telephone due to the severity of their mental illness and symptoms, such as extreme paranoia, mania, or depression. Because of the lack of confidential VTC visits and legal phone calls, and the issues with in-person legal visits described above, AIJ is often unable to take these cases or investigate and build advocacy or litigation strategies regarding these reports of abusive conditions of confinement.

140. Many of AIJ's Detained Clients with Disabilities at Krome have also historically endured instances of trauma and violence, including civil war and sexual assault, that exacerbate their conditions and make it imperative for AIJ to reliably consult with them in-person, via VTC visits, and through secure, confidential telephone calls on a frequent and regular basis so that they can safely and securely share sensitive case information.

141. At Krome, Detained Clients with Disabilities who are placed in solitary confinement are cut off from access to telephones and the messaging app, which is essential to contacting counsel. Detained Clients with Disabilities who are placed in solitary confinement also experience severe deterioration of mental health, making it more difficult to establish effective communication with counsel, thus further degrading the attorney-client relationship. For example, at least one client with serious mental illness who was placed in solitary confinement at Krome became even more withdrawn and could no longer engage in regularly scheduled phone calls.

142. These attorney access restrictions have impeded AIJ's ability to assess complaints regarding conditions of confinement by Detained Clients with Disabilities at Krome, and timely determine an appropriate advocacy or litigation strategy to ameliorate those conditions. This is especially detrimental for Detained Clients with Disabilities suffering from severe mental illnesses whose symptoms are greatly exacerbated by traumatic, inhumane, or abusive treatment.

For example, AIJ currently represents a blind individual who suffers from psychotic symptoms and episodes. AIJ is assisting this individual in a request for release from detention and engaging in an advocacy campaign to address abusive conditions of confinement at Krome. This individual was unable to send AIJ the necessary documents for his case because he was placed in segregation housing and his psychotic symptoms inhibited basic functioning and his ability to navigate onerous procedures at Krome to copy documents and send legal mail. Ultimately, an AIJ attorney had to travel to Krome to secure the documents in person, but these restrictions delayed submission of his release request and complaint to the Department of Homeland Security Office of Civil Rights and Civil Liberties ("CRCL"), causing AIJ's client to suffer unnecessarily at Krome and prolonging his time in detention.

**129.** 143. Plaintiff FIRRP, Plaintiff AIJ, and their**its** Detained Clients with Disabilities have suffered a concrete harm to their abilities**ability** to communicate effectively about matters crucial to legal representation.

**130.** 144. In some cases, FIRRP attorneys have experienced periods—from days to months—where they could not access Detained Clients with Disabilities at all because of these barriers. Defendants' failure to ensure FIRRP attorneys can communicate effectively with their Detained Clients with Disabilities has caused them to lose many hours to failed visitation attempts and unnecessary travel, thereby diminishing FIRRP's resources and undermining its ability to provide quality representation to other clients. This is in contrast to attorney access to clients at the Central Arizona Detention Center, managed together with Florence as part of the same correctional complex, where criminal defense attorneys meet with their clients directly in the mental health units, and where VTC phone access is available.

~~145. Restrictions on regular, reliable, and confidential access to Detained Clients with Disabilities at Krome have required AIJ to turn away cases of prospective clients with severe mental illness and has injured its ability to secure favorable, expeditious outcomes in bond and parole proceedings and in filing complaints related to unconstitutional conditions of confinement. This harms AIJ's ability to perform its work in furtherance of the organization's mission and objectives and injures AIJ's Detained Clients with Disabilities by impeding AIJ in its ability to provide legal services and representation.~~

**III.** ~~**IV.**~~ **DEFENDANTS' RESTRICTIONS ON ACCESS TO COUNSEL AT** ~~**THE FOUR DETENTION FACILITIES**~~**FLORENCE HARM** ~~**PLAINTIFFS**~~**PLAINTIFF AND DETAINED CLIENTS**

**A.    The Restrictions on Attorney-Client Communication Impair** ~~**Plaintiffs'**~~**Plaintiff's Ability to** ~~**Effectively Advocate for**~~**Provide Effective Legal Representation to Detained Clients and Harm Detained Clients.**

**131.** ~~146.~~ Defendants' restrictions on attorney-client communications interfere with Detained Clients' ability to communicate effectively with their counsel and ~~Plaintiffs'~~**Plaintiff's** ability to provide effective legal services to ~~their~~**its** clients. Defendants' restrictions affect all aspects of attorney-client communication necessary for representation, including, among other things: (i) conducting an initial assessment of Detained Clients' legal claims and eligibility for substantive and procedural relief (*e.g.*, release from custody); (ii) interviewing Detained Clients to obtain personal statements relating to sensitive facts supporting their cases; (iii) gathering information to investigate whether Detained Clients face inadequate conditions of confinement, such as medical neglect, unsanitary conditions, or physical abuse; (iv) counseling Detained Clients as to their legal options and developments in their cases; (v) obtaining signatures on release forms when seeking Detained Clients' records from outside agencies; and (vi) preparing Detained Clients for testimony, questioning, or cross-examination by government attorneys or

officials. Effectively completing these tasks requires lengthy conversations between Detained Clients and their counsel that involve complex issues, often with the assistance of interpreters and other case-related personnel. Defendants' restrictions on such ~~communication~~**communications** prevent Detained Clients and ~~Plaintiffs~~**Plaintiff** from having these necessary exchanges in a timely and reliable manner—a particularly urgent issue in ~~emergent~~**pressing** situations requiring an immediate attorney visit, such as in cases involving bond hearings or urgent complaints regarding conditions of confinement.

**132.** ~~147.~~ Detained Clients' inability to communicate confidentially with attorneys has a particularly negative impact on the ability to provide adequate representation. Without confidential communication, a lawyer cannot fully assess whether a client is eligible for release from detention, whether the conditions of confinement should be challenged, or ~~other types of legal claims~~**whether** the client may be entitled to pursue~~. Without confidential communication, a~~ other types of legal claims**. A** lawyer is similarly prevented from gathering the information and evidence necessary to effectively prepare a case. For example, to prepare for a client's bond hearing or other request for release, attorneys must ask their clients about sensitive topics. These conversations may include details of past persecution; underlying medical conditions that put the client at greater risk from COVID-19 infection; personal and family circumstances; whether a client is in recovery from substance use; and, if relevant, facts about any criminal history. To gather facts about abusive conditions in detention, an attorney may need to delve into sensitive information in a potentially retaliatory environment, and explain procedures for reporting misconduct by facility staff or ICE. If an attorney needs to include this information in a written declaration or use this information to prepare a client to testify on these matters in an adversarial

proceeding, as is often required, these conversations can take several hours and require multiple visits to solicit relevant information and counsel the client.

**133.** ~~148.~~ Without safe, confidential settings to discuss these sensitive issues, Detained Clients are less willing to share private information about their cases, which undermines ~~Plaintiffs'~~ **Plaintiff's** ability to provide Detained Clients with legal advice and to adequately prepare for matters such as their bond and parole applications or conditions-of-confinement cases. ~~In addition~~**For example, FIRRP client Mugisha reported that this harmed his case because there is some information he was never able to share with his lawyer because he did not have the private space. Another FIRRP client, Guadalupe, reported that absent the difficulties in communicating with counsel, she would have been able to give more details about what happened to her and would not have felt like she needed to withhold information that her attorney might have wanted or needed to know. Relatedly**, without a method to ensure confidentiality in all attorney-client communications at ~~the Four Detention Facilities~~**Florence**, attorneys, mindful of protecting privilege, are limited in the types of questions they can ask Detained Clients and the advice and counsel that they can provide.

**134.** ~~149.~~ Defendants' restrictions on attorney-client communication at ~~the Four Detention Facilities harms Plaintiffs'~~**Florence harms Plaintiff's** ability to advocate for Detained Clients and, as a result, impacts the relief Detained Clients obtain. For example, without the ability to schedule calls, attorneys have no way to ensure that they can promptly speak to their clients at a time when both parties are available, leading to tremendous inefficiencies and delays in communication. These delays have material consequences on the effectiveness of the representation, particularly when time-sensitive matters, such as bond hearings, are at issue.

150. For example, at River, an ISLA attorney was unnecessarily delayed in submitting a parole request and bond application on behalf of their Detained Client based on the client's medical condition because of the lack of any confidential means to communicate with the Detained Client. Instead, the ISLA attorney had to obtain the client's medical records that contained the required information, which took a week and a half—adding to the time the client remained detained. Ultimately, these delays, caused by the lack of means to confidentially communicate at River, likely led ISLA's client to remain detained longer than necessary (he was ultimately released on bond, and his bond application included his medical condition).

151. As another example, RAICES had a female client who had chronic sinusitis and suffered from painful cysts that worsened because ICE had taken away the client's birth control medication. These conditions ultimately formed the basis of a request for release from detention. Due to past trauma, the client was only comfortable speaking with female RAICES staff. But delays in scheduling private calls slowed RAICES attorneys' ability to gather and document important medical information, which delayed a release request and unnecessarily prolonged the client's detention.

152. In other cases, Plaintiffs have been hampered or entirely prevented from bringing otherwise viable legal claims or seeking relief on behalf of Detained Clients.

**B. Defendants' Restrictions Impede Plaintiffs' Organizational Missions and Inhibit Their Daily Operations.**

**135.** 153. In addition to injuring Detained Clients by depriving them of access to counsel, Defendants' failure to ensure compliance with the Constitution, federal law, and the Detention Standards harms Plaintiffs by**injures Plaintiff by making it more difficult to provide effective legal representation to Detained Clients, thus** directly impeding their organizational missions and interfering with their daily operations.

**B.** **Defendants' Restrictions Forces Plaintiff to Use Limited Resources to Counteract the Harm Caused by Defendants' Attorney Access Restrictions.**

**136.** ~~154.~~ **Plaintiff must use its resources to counteract the harm caused by Defendants' attorney access restrictions.** The restrictions on access to counsel at ~~the Four Detention Facilities~~**Florence** cause ~~Plaintiffs~~**Plaintiff** to expend more resources to carry out ~~their~~**its** organizational missions than ~~they~~**it** would otherwise normally require. For example, due to restrictions on telephone, VTC, email, fax, and mail at certain detention facilities, ~~Plaintiffs~~**Plaintiff** must incur expenses and spend time traveling to certain detention facilities, even for simple or brief matters that could otherwise be addressed remotely. Those in-person meetings may entail significant wait times and may not be confidential. Even when a remote option is available, ~~Plaintiffs~~**Plaintiff** may incur additional costs. With telephone calls, for example, ~~Plaintiffs~~**Plaintiff** may incur exorbitant charges of up to $20 for a 25-minute collect call from a Detained Client.

~~155. The access to counsel barriers at River cause ISLA to expend approximately twice the amount of time, money, and resources to represent Detained Clients as would be required without Defendants' barriers. ISLA spends an average of $1,080 per month in additional resources for a single case at River due to costs incurred from, among other things, the six-hour drive to and from the ISLA office to River. These obstacles have actively and directly prevented ISLA from being able to represent approximately twice as many prospective Detained Clients detained at River.~~

~~156. RAICES attorneys are forced to devote, at minimum, double the time and resources to arrange a remote meeting at Laredo as compared to other detention centers RAICES serves. Because Laredo staff refuse to reliably schedule calls in advance, in order to speak to a Detained Client at Laredo, RAICES staff have needed to clear large blocks of time and cancel meetings~~

with other clients detained in other facilities in order to remain available. The obstacles to access to counsel are so severe at Laredo, and have had such a negative impact on RAICES's ability to serve clients at Laredo and other detention facilities, that RAICES has paused taking new cases at Laredo. RAICES continues to operate a hotline at Laredo and would resume taking new cases if access to counsel were improved. This pause in RAICES services due to lack of access frustrates RAICES's mission to provide legal services to detained immigrants in Texas detention facilities and deprives detained immigrants of the benefit of RAICES's services.

**137.** 157. These access barriers also hinder**By hindering** FIRRP's mission and ability to **effectively** represent detained clients. These constraints have increased the time required to prepare **at Florence, FIRRP must spend more time preparing** each case, doubling the amount of time it would otherwise take to represent a detained client. FIRRP staff are forced to conduct in-person visits for even the most minor aspects of case preparation, including obtaining signatures, asking clarifying questions, or**and** confirming document receipt. FIRRP attorneys who could otherwise complete intake interviews or other brief conversations by phone or VTC are forced to make a two-hour drive to and from the office**their offices** to visit the facility. Legal staff must delay other case work, including drafting briefs, preparing for arguments, or appearing in court due to these barriers.

158. Access to counsel barriers at Krome also harm AIJ's ability to carry out its mission and provide representation to detained immigrants. These barriers have reduced AIJ's ability to accept more cases for representation at the Krome Immigration Court and engage in other forms of advocacy challenging conditions of confinement and abuse at the facility. AIJ attorneys have less opportunity and time to build rapport with clients, review evidence, and prepare for cases. AIJ staff are also forced to waste time, resources, and money by traveling to Krome for matters

~~that could otherwise be handled by phone, VTC, fax, or email, further reducing the number of cases AIJ can accept.~~

~~159. The lack of clear, reliable, and established policies for attorneys to contact Detained Clients remotely uniquely impedes IJC's work and mission. IJC is a national organization that recruits volunteer attorneys nationwide to work with people in detention, particularly those located in geographically isolated locations. For that reason, clear and established systems for remote communication are critical to allow pro bono attorneys to work effectively with Detained Clients. The access to counsel barriers at Krome, River, Florence, and Laredo require IJC to spend significant time working individually with volunteer attorneys to navigate the most basic means of establishing and maintaining contact with clients, instead of providing substantive legal training in group settings. These obstacles have also forced IJC to take cases back from volunteer attorneys who are unable to overcome these access barriers.~~

**IV.** ~~V.~~ **DEFENDANTS HAVE VIOLATED** ~~PLAINTIFFS'~~**PLAINTIFF'S** **AND DETAINED CLIENTS' CONSTITUTIONAL AND STATUTORY RIGHTS**

**A.   Defendants Are Responsible for Monitoring, Inspection, and Oversight of Conditions at** ~~the Four Detention Facilities~~**Florence.**

**138.** ~~160.~~ Detained immigrants are held under the custodial authority of Defendants, including ~~the~~ DHS, and DHS has delegated that authority to its component agency, ICE.[45]~~[44]~~ The Constitution and federal law impose non-delegable and non-negotiable requirements for the treatment of detained immigrants in Defendants' custody. As a result, Defendants are responsible for the conditions at the detention facilities, including ~~the Four Detention~~

---

[45]~~[44]~~ *See* 8 U.S.C. § 1103(a)(1); 8 C.F.R. § 2.1 (Secretary of Homeland Security has authority to administer and enforce the immigration laws, which may be delegated to any DHS official, officer or employee); 8 C.F.R. § 100.1 (authority to administer and enforce immigration laws has been delegated to ICE, as well as U.S. Customs and Border Protection and U.S. Citizenship and Immigration Services).

~~Facilities~~**Florence**—even where they have contracted with third parties to operate the facilities. Defendants are required to oversee, monitor, and manage the conditions at detention facilities, and, where needed, remedy deficient conditions.

**139.**   ~~161.~~ ICE's own statements and policies, such as the Detention Standards, underscore that access to counsel conditions at detention facilities, including ~~the Four Detention Facilities~~**Florence**, are Defendants' responsibilities.

140.   According to ICE, the purpose of its Detention Standards is to establish "consistent conditions of confinement, access to legal representation~~,~~ and safe and secure operations across the detention system."**[45] The Detention Standards are binding on Defendants. They are incorporated into the contracts between ICE and the third-party operators of detention facilities, including Florence. In addition, they are facially mandatory: they repeatedly state that facilities "shall" or are "required"** to adhere to the standards.[46]

**141.**   ~~162.~~ Defendants purport to fulfill their responsibility to ensure that individual facilities adhere to ICE's Detention Standards through a system of monitoring, inspection, and oversight. ICE claims that it aims to ensure **that** detained people in its custody reside in "safe, secure and humane environments" by maintaining an "aggressive inspections program" that is

---

[45] **ICE,** *Detention* *Management* **(Nov. 18, 2022, 3:33 PM), https://www.ice.gov/detention-management [https://web.archive.org/web/20221118153312/https://www.ice.gov/detain/detention-management].**

[46] ~~ICE, *Detention Management*~~*See, e.g.,* **2008 PBNDS § 5.26(V)(D) (using "shall" in provisions pertaining to correspondence);** *see also* ICE, *2008 Operations Manual ICE Performance-Based National Detention Standards* (last updated ~~Sept~~**Feb**. ~~29~~**18**, 2022), https://~~www.ice.gov/detention-management~~**bit.ly/3gDOUli (stating that the 2008 PBNDS prescribe "requirements")**

designed to ensure compliance with ICE's Detention Standards.[47] These internal mechanisms include, among other things, a detention monitoring program conducted by ICE's Enforcement and Removal Operations ("ERO") and its Office of Detention Oversight ("ICE-ODO").[48] **ICE-ODO inspects detention facilities that hold ICE detainees for over 72 hours (and have an average daily population of over 10 detainees) about once every three years.[49]**

**142.** ~~163.~~ ERO is a subcomponent of ICE**, which is** headquartered in the District of Columbia ~~that~~**and** is directed by Defendant ~~Johnson~~**Lechleiter**. ERO "manages and oversees" ICE's Detention Facilities, including ~~the Four Detention Facilities.[49]~~**Florence.[50]** ERO's Custody Management Division, headquartered in the District of Columbia, "provides policy and oversight for ~~. . . administrative~~**those in ICE** custody,"~~[50]~~**[51]** and "[m]anages ICE detention operations to efficiently and effectively provide for the safety, security, and care of persons in ICE custody."~~[51]~~**[52]**

### B.    Defendants Fail to Adequately Manage and Oversee Detention Facilities, Including ~~the Four Detention Facilities~~**Florence**.

**143.** ~~164.~~ Defendants have failed to meet their management and oversight responsibilities to ensure that ICE detention facilities, including at ~~the Four Detention~~

---

[47] ~~*Id*~~ ICE, *Detention Management, supra* note **45**.

[48] *See* DHS Off. Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance of Systemic Improvements*~~,~~ **(the "2018 DHS-OIG Report"),** at 1, 3 (June 2018), https://bit.ly/2Mwp2Ug.

**[49] *Id.* at 3.**

[49] ICE, *Detention Management, supra* note 46.

**[50] ICE, *Detention Management, supra* note 45.**

~~[50]~~**[51]** *Fraihat v. ICE*, 16 F.4th 613, 623 (9th Cir. 2021) (citation omitted); ICE, *Enforcement and Removal Operations* (last updated ~~Oct. 6~~**June 27**, ~~2022~~**2023**), https://www.ice.gov/about-ice/ero.

~~[51]~~**[52]** *Enforcement and Removal Operations*, *supra* note ~~50~~**51**.

Facilities**Florence**, provide access to counsel consistent with constitutional and federal law requirements, as well as with their own standards.

**144.** 165. As described above, ICE has established Detention Standards that provide rules and requirements for legal correspondence, telephone access, and legal visitation in immigration detention facilities. The standards are incorporated through contracts and are binding on the Four Detention Facilities. ICE initiates and conducts compliance reviews and inspections to ensure compliance with the Detention Standards.

**145.** 166. These Detention Standards set forth specific requirements for attorney-client access, including requirements (i) that meetings between detained people and attorneys or legal assistants be confidential and not subject to auditory supervision;52**53** (ii) that private consultation rooms be made available for attorney-client visits;53**54** (iii) that legal visits be available seven days a week, including holidays, for a minimum of eight hours per day on regular business days and four hours per day on weekends and holidays;54**55** (iv) that detained persons with limited English proficiency have access to interpretation in legal visits;55**56** (v) that calls made to legal representatives and/or other legal service providers shall be easily accessible and allowed to be

---

52**53** 2008 PBNDS at 5.32(V)(J)(9); 2011 PBNDS at 5.7(V)(J)(9); 2019 NDS at 5.5(II)(G)(8).

53 2008 PBNDS54 *Id.* at 5.32(V)(J)(9); 2011 PBNDS at 5.7(V)(J)(9); 2019 NDS at 5.5(II)(G)(8).

54 2008 PBNDS55 *Id.* at 5.32(V)(J)(2); 2011 PBNDS at 5.7(V)(J)(2); 2019 NDS at 5.5(II)(G)(2).

55**56** *See* 2008 PBNDS*id.* at 5.32(V)(J)(3)(c) (stating that "[t]he facility shall permit interpreters to accompany legal representatives and legal assistants on legal visits, subject to Visitor Identification and Search Procedures"); 2011 PBNDS at 5.7(V)(J)(3)(c) (same); 2019 NDS at 5.5(II)(G)(3)(c) (same, but stating that interpreters shall "undergo the regular security clearance process"). *See also* 2011 PBNDS at 5.7(II)(10) (stating that "[t]he facility shall provide communication assistance to detainees . . . who are limited in their English proficiency," including "bilingual staff or professional interpretation and translation services").

made as soon as possible after submission of requests;[56][57] (vi) that facilities promptly deliver telephone messages to detainees;[57][58] (vii) that facilities provide detainees with direct or free calls to their legal representatives and/or other legal service providers;[58][59] (viii) that detainees can make calls relating to legal matters without being overheard by ~~officers, other~~ staff~~,~~ or other detainees;[59][60] and (ix) that legal calls not be restricted to less than 20 minutes.[60][61]

146.   ~~167.~~ The DHS Office of Inspector General ("DHS-OIG") has noted ICE's consistent failure to enforce compliance with its Detention Standards through its inspection and review process. In a 2018 report, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, the DHS-OIG concluded that "neither the inspections nor the onsite monitoring ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections."[61][62] The DHS-OIG further noted that "ICE's inspections, follow-up processes, and onsite monitoring of facilities . . . do not ensure adequate oversight or systemic improvements in detention conditions, with some deficiencies remaining unaddressed for years."[62][63] **The DHS-OIG report specifically criticized inspections conducted by ICE-ODO and ICE contractor, the Nakamoto Group.[64]**

---

[56] ~~2008 PBNDS~~[57] *Id.* at 5.31(V)(E)(1), (2)~~; 2011 PBNDS at 5.6(V)(D)(E)(1), (2). 2019 NDS at 5.4(II)(E).~~

[57] ~~2008 PBNDS~~[58] *Id.* at 5.31(V)(J)~~; 2011 PBNDS at 5.6(V)(J); 2019 NDS at 5.4(II)(I).~~

[58] ~~2008 PBNDS~~[59] *Id.* at 5.31(V)(E)~~; 2011 PBNDS at 5.6(V)(E); 2019 NDS at 5.4(II)(E).~~

[59] ~~2008 PBNDS~~[60] *Id.* at 5.31(V)(F)(2) (staff or other detainees)~~; 2011 PBNDS at 5.6(V)(F)(2) (same); 2019 NDS at 5.4(II)(J) (officers, other staff, or other detainees).~~

[60] ~~2008 PBNDS~~[61] *Id.* at 5.31(V)(F)(1)~~; 2011 PBNDS at 5.6(V)(F)(1); 2019 NDS at 5.4(II)(F).~~

[61] ~~DHS Off. Inspector Gen.,~~ *~~ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance of Systemic Improvements~~*[62] **2018 DHS-OIG Report**, *supra* note ~~48~~**48**.

[62][63] *Id.*

[64] **As of October 1, 2022, ICE-ODO "has the congressionally mandated responsibility to conduct ICE detention facility inspections." ICE,** *ODO ICE Facility Inspections,*

147.   168. ICE's failure to ensure compliance with its Detention Standards **also extends specifically to provisions** regarding access to counsel ~~is no different~~. ICE's inspections fail to inspect for and/or enforce violations of its rules regarding access to counsel in detention. As the agency admitted to Congress ~~earlier this~~**last** year, ICE ERO "does not track . . . the number of facilities that do not meet ICE standards for attorney/client communications."[~~63~~65]

**148.   ODO inspections are neither comprehensive nor frequent enough to ensure compliance with constitutional protections for detainees, particularly when considered against the reality of conditions at detention facilities, including at Florence. Beginning in Fiscal Year 2022, ICE-ODO instituted a process "of rotating all standards on a 3-year basis,"[66] meaning that at a minimum, certain standards will be assessed only every six years. Moreover, as part of this process, "some standard components may not be present in all standards."[67]**

**149.   Nakamoto facility inspections similarly cannot be credited because, according to the 2018 DHS-OIG report, ICE's guidance to Nakamoto was "unclear" and Nakamoto's inspection practices were "not consistently thorough," leading to the inspections' failure to "fully examine actual conditions or identify all compliance**

---

**conduct ICE detention facility inspections." ICE, *ODO ICE Facility Inspections*, https://www.ice.gov/foia/odo-facility-inspections (last visited Mar. 17, 2023). ICE had contracted with the Nakamoto Group since 2007. 2018 DHS-OIG Report, *supra* note 48, at 2, n.4.**

[~~63~~65] ICE, *Access to Due Process: Fiscal Year 2021 Report to Congress*, *supra* note ~~4~~4, at 2.

**[66] *See* ICE-ODO, *Unannounced Compliance Inspection of CCA Florence Correctional Center* at 6 n.6 (Nov.-Dec. 2022), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2022-CCAFlorenceCC-FlorenceAZ-December.pdf ("Nov. 2022 Florence Inspection").**

**[67] *Id.***

deficiencies."[68]  In fact, employees of Defendant ICE characterized the inspections as "useless" and noted that Nakamoto inspectors do not actually assess whether facilities are implementing the Detention Standards.[69]

    **C.**    **Defendants Can Require Improvements to Attorney Access at Florence Via Contract.**

    **150.**    The ICE Office of Acquisition Management ("OAQ"), based in the District of Columbia, "negotiates and manages detention facility contracts and agreements."[70] OAQ's mission is to "deliver quality acquisition solutions in support of the ICE and DHS missions."[71] OAQ's procurements include: "[l]aw enforcement services and products, including handcuffs, hand restraints, guns and ammunition" and "[d]etention and removal services such as temporary housing, food, clothing and transportation, including air charter flights."[72] This office additionally approves subsequent amendments to contractual agreements to provide funding for, among other things, structural improvements to the facilities. All contracting and procurement responsibilities are centralized at ICE's headquarters in Washington, D.C.

    **151.**    Defendants could require improvements to attorney access conditions at Florence described herein, including lack of private, confidential attorney-client meeting rooms; lack of free, scheduled, private, confidential telephone and VTC access for legal

---

[68] **2018 DHS-OIG Report,** *supra* note 48, at 4.

[69] *Id.* at 7 n.12.

[70] U.S. Gov't Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards* 2 (October 2014), https://www.gao.gov/assets/670/666467.pdf.

[71] *Office of Acquisition Management (OAQ)*, Immigration and Customs Enforcement, https://www.ice.gov/management-administration/oaq (last updated Feb. 10, 2022).

[72] *Id.*

communication; and lack of access to fax or email document exchange through the enactment of contract requirements. While including clear contractual requirements is not necessarily sufficient to ensure meaningful attorney access, as demonstrated by violations of the Detention Standards, Defendants are able to require facilities to provide additional channels of attorney access by way of contractual arrangements, as evidenced by their efforts in other facilities. For example, in 2014, ICE amended its service contract for Stewart Detention Center in Lumpkin, Georgia to "implement a videoconferencing platform to allow detainees to consult with their attorneys in preparation for administrative immigration proceedings at the Stewart Detention Center."[73] In 2020, ICE amended its service contract at the Kandiyohi County Detention Center in Willmar, Minnesota, to "incorporate virtual attorney visitation."[74] More recently, in 2021, ICE amended its service contract agreement at the Denver Contract Detention Facility in Aurora, Colorado, to "incorporate attached Virtual Attorney Visitation . . . into the contract at no cost."[75] As described in the Denver contract, VAV "utilizes common web conferencing and videoconferencing applications to enable legal representatives to meet with their clients or prospective clients virtually using video technology in private rooms or

---

[73] Amendment of Solicitation of Contract, ICE Detention Management, Stewart County GA, Sept. 30, 2014, at 38, https://www.ice.gov/doclib/foia/detFacContracts/DROIGSA-06-00005_StewartCoLumpkinGA.pdf.

[74] Amendment of Solicitation/Modification of Contract, U.S. ICE and Kandiyohi County, Aug. 9, 2020, at 2, https://www.ice.gov/doclib/foia/detFacContracts/ACD-2-H-1005_KandiyohiCoIGSA_WilmarMN.pdf.

[75] Amendment of Solicitation/Modification of Contract, ICE and GEO Group, Oct. 15, 2021, at 1-3, https://www.ice.gov/doclib/foia/detFacContracts/70CDCR22D00000001-Denver.pdf.

booths to ensure confidentiality of communications during remote legal visits."[76] The Denver contract also required "procedures, in writing, through which detained individuals and legal representatives may exchange confidential documents, via electronic means (e.g. facsimile or email), such as to obtain signatures."[77]

152.     In contrast, upon information and belief, ICE's service contracts make no specific mention whatsoever regarding attorney access at Florence beyond the requirement to comply with the Detention Standards.

### D.     Access to Counsel Deficiencies in ICE Detention Facilities Nationwide Demonstrate Defendants' Oversight and Enforcement Failures.

153.   169.   On November 3, 2022, 28 members of Congress wrote to DHS Secretary Mayorkas and ICE ICE's former Acting Director Johnson expressing their deep concern with ICE's failure to ensure that immigrants can access their legal representation in detention. Their letter noted ICE's "systematic failure to ensure that people in ICE detention have the ability to find and communicate with attorneys, directly refuting ICE's reporting to Congress on access to counsel issues in FY 21." The Congressional letter also noted that "ICE has failed as an agency to exercise even the most basic oversight or data collection regarding immigrants' access to counsel in detention."[64][78]

170.   ICE's most recent inspection reports for the Four Detention Facilities further demonstrate ICE's failure to inspect for or enforce violations of detention standards related to access to counsel.

---

[76] *Id.* at 2.

[77] *Id.* at 3.

[64][78] Letter from Twenty-Eight Members of Congress to Alejandro Mayorkas, Secretary of DHS, and Tae Johnson, **former** Acting Director, ICE (Nov. 3, 2022), https://bit.ly/3UsZMBI.

171. From March 21 to 24, 2022, ICE ODO conducted an inspection of Laredo's compliance with detention standards.[65] The inspection report notes that ODO assessed only 19 of 33 standards under the 2019 NDS, and found three deficiencies.[66] The inspection report, however, indicates that ICE inspectors did not investigate detention standards associated with attorney-client access described above,[67] including 2019 NDS Standard 5.4 (Telephone Access) and Standard 5.5 (Visitation). The only mention of any standard related to attorney-client access in the inspection report is a discussion of the facility's handbook, which did not notify detained people of the process for inspecting general, not legal, correspondence.[68]

172. From May 10 to 12, 2022, ICE ODO conducted an inspection of River's compliance with detention standards.[69] The inspection report notes that ODO assessed only 17 standards under the 2011 PBNDS, and found 13 deficiencies.[70] The inspection report, however, indicates that ICE inspectors did not investigate detention standards associated with attorney-client access described above,[71] including 2011 PBNDS Standard 5.6 (Telephone Access) and Standard 5.7 (Visitation). The only mention of any standard related to attorney-client access is a discussion of

[65] DHS, ICE Off. Det. Oversight, *Compliance Inspection of the Laredo Processing Center* (2022), https://bit.ly/3MRA1H1.

[66] *Id.* at 8.

[67] *See id.* at 6.

[68] *Id.* at 8.

[69] DHS, ICE Off. Det. Oversight, *Follow-Up Compliance Inspection of the River Correctional Center* (2022), https://bit.ly/3Sm9LH8.

[70] *Id.* at 11.

[71] *See id.* at 6.

the facility's handbook, which did not notify detained people of the process for outgoing legal mail.[72]

173. From May 10 to 12, 2022, ICE ODO also conducted an inspection of Krome's compliance with detention standards.[73] The inspection report notes that ODO assessed only 18 standards under the 2011 PBNDS, and found six deficiencies.[74] The inspection report, however, indicates that ICE inspectors did not investigate detention standards associated with attorney-client visitation, including Standard 5.7 (Visitation).[75] ODO investigated 2011 PBNDS Standard 5.6 (Telephone Access), but found no violation.[76]

174. From June 28 to 30, 2022, ICE ODO conducted an inspection of Florence's compliance with detention standards.[77] The inspection report notes that ODO assessed only 17 standards under the 2008 PBNDS, and found 40 deficiencies.[78] The inspection report, however, indicates that ICE inspectors did not investigate detention standards associated with attorney-client visitation, including Standard 5.26 (Correspondence and Other Mail) and Standard 5.32 (Visitation).[79] ODO investigated PBNDS 2008 Standard 5.31 (Telephone Access) and found that the facility had no documentation for inspecting and logging telephones daily.[80]

[72] *Id.* at 9.

[73] DHS, ICE Off. Det. Oversight, *Follow-Up Compliance Inspection of the Krome North Service Processing Center* (2022), https://bit.ly/3eZ2Vtc.

[74] *See id.* at 6.

[75] *See id.*

[76] *Id.*

[77] DHS, ICE Off. Det. Oversight, *Follow-Up Compliance Inspection of the CCA Florence Correction Center* (2022), https://bit.ly/3MTv29U.

[78] *Id.* at 19.

[79] *See id.* at 6.

[80] *Id.* at 18

**C. Access to Counsel Deficiencies in ICE Detention Facilities Nationwide Demonstrate Defendants' Oversight and Enforcement Failures.**

**154.** ~~175.~~ In 2022, the ACLU published "No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Facilities," which documented the results of ~~the~~ "the first comprehensive study of the denial of access to counsel in U.S. immigration detention centers nationwide."[79] The report analyzes the results of research conducted at 148 detention facilities and survey responses submitted by 89 immigration attorneys and legal representatives about their experiences,[80] and demonstrates that the issues at ~~the Four Detention Facilities~~**Florence** discussed above are not isolated, but rather are systemic and reflective of Defendants' oversight and enforcement failures.

**155.** ~~176.~~ At least 20 surveyed facilities delayed or completely denied in-person attorney access to clients because of the facility's own failure to keep track of detained people, inadequate staffing, or arbitrary and changing attorney dress code rules.[81] At least one-third of the facilities the ACLU surveyed do not permit attorneys to have contact visits where attorneys and clients sit together at a table without barriers, which impedes clear communication and the confidential review of documents.[82]

**156.** ~~177.~~ The ACLU report found "pervasive" problems with legal telephone access, noting that at 20% of the detention facilities called by their researchers in the study, "no one ever picked up the phone or operators refused to answer basic questions about attorney access."[83]

---

[79] ACLU, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Facilities*, *supra* note ~~5~~6, at 5.

[80] *Id.* at 6-7.

[81] *Id.* at 8.

[82] *Id.* at 25.

[83] *Id.* at 12.

The results for the facilities that did answer the questions were abysmal. At least 58 ICE detention facilities do not allow attorneys to schedule phone calls with clients at a certain date and time.[8684] Of the 37 facilities **that** the ACLU surveyed that permit attorneys to schedule legal calls with their clients, only about half consistently honored these scheduled calls.[8785]

**157.** ~~178.~~ The lack of VTC access at ICE facilities is also a systemic problem. Almost half of the surveyed detention facilities were found to have no VTC program for attorneys and clients and the ACLU could not determine whether a legal-specific VTC program existed at an additional 18% of facilities.[8886] The inability to send and receive legal documents in a timely manner is a nationwide problem as well. Attorneys at 19% of the detention facilities surveyed reported that they or their clients missed a filing deadline due to problems with legal mail.[8987] The majority of detention facilities surveyed also do not provide detained people with access to email or electronic message alternatives to communicate with their attorneys.[9088]

**158.** ~~179.~~ The pervasive issues with access to counsel in immigration detention centers are well documented. In 2009, two advocacy groups, along with the law firm Holland & Knight, published a report entitled "A Broken System: Confidential Reports Reveal Failures in U.S. Immigrant Detention Centers," which found that "the persistent failures of facilities to respect detainees' visitation rights severely hampers detainees' ability to exercise their constitutional and statutory rights of access to counsel."[9189] It also found that ICE had consistently failed to ensure

---

[8684] *Id.* at 13.

[8785] *Id.* at 15.

[8886] *Id.* at 18.

[8987] *Id.* at 21.

[9088] *Id.* at 20.

[9189] Nat'l Immigr. L. Ctr. et al., *A Broken System: Confidential Reports Reveal Failures in U.S. ~~Immigration~~**Immigrant** Detention Centers*, at viii (2009), https://www.nilc.org/wp-content/uploads/2016/02/A-Broken-System-2009-07.pdf.

compliance with telephone standards, noting that "the most pervasive and troubling violations are lack of privacy afforded to detainees when making confidential legal calls, monitoring of legal calls by facility ~~officials~~**official[s]** . . . arbitrary and unnecessary time limits placed on detainees' telephone calls, and refusal by facility staff to deliver telephone messages to detainees."[~~92~~**90**]

**159.** ~~180.~~ In 2015, three national non-profit organizations issued a report entitled "Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse."[~~93~~**91**] The authors reviewed five years' worth of ICE inspections for 105 of the largest immigration detention prisons in the country and concluded that ICE's inspection process "remains a 'checklist culture**,**'" where inspectors, either directly employed by ICE or via subcontracts, conduct "perfunctory reviews of detention facilities that are designed to result in passing ratings.~~. . .~~"[~~94~~**92**]

**160.** ~~181.~~ In October 2021, more than 80 nonprofit organizations, including ~~Plaintiffs~~**Plaintiff**, delivered a letter to DHS and ICE highlighting many of the obstacles to access to counsel described in this ~~complaint~~**Complaint** and recommending ways to remove those obstacles.[~~95~~**93**] For example, the letter called attention to ICE's "refusal to schedule legal calls with clients, failure to provide a timely way to have clients review and sign necessary

---

[~~92~~**90**] *Id.* at ix.

[~~93~~**91**] Nat'l Immigr. Just. Ctr. et al., *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse* (2015), https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2017-03/THR-Inspections-FOIA-Report-October-2015-FINAL.pdf.

[~~94~~**92**] *Id.* at 2.

[~~95~~**93**] ACLU, *Coalition Letter to DHS and ICE on Access to Counsel in Immigration ~~Proceedings~~Detention* (2021), https://www.aclu.org/letter/coalition-letter-dhs-and-ice-access-counsel-immigration-detention.

documents, ~~its~~**. . .** hostile treatment of attorneys at detention centers and failure to provide sufficient private attorney-client meeting space leading to long waits, and a host of other challenges that have reduced the number of attorneys able and willing to take detained cases."~~96~~**94** However, conditions at ~~the Four Detention Facilities~~**Florence** remain inadequate for ~~Plaintiffs~~**Plaintiff** and their Detained Clients.

### FIRST CLAIM FOR RELIEF

**Denial of Substantive Due Process in Violation of the Fifth Amendment**
**(~~AIJ, FIRRP, IJC, ISLA, and RAICES~~ on behalf of Detained Clients ~~at the Four Detention Facilities~~)**

**161.** ~~182. Plaintiffs reallege and incorporate~~**Plaintiff realleges and incorporates** by reference the foregoing paragraphs and incorporates them herein by this reference.

**162.** ~~183.~~ The Fifth Amendment's Due Process Clause prohibits holding civil detainees in conditions that rise to the level of punishment.

**163.** ~~184.~~ Conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, and/or that are excessive in relation to that objective, constitute punishment of civil detainees in violation of the Due Process Clause.

**164.** ~~185.~~ The conditions of confinement for Detained Clients ~~at the Four Detention Facilities~~ meet that standard and therefore violate the Due Process Clause.

**165.** ~~186.~~ The restrictions on attorney access described herein violate the Due Process Clause because they, individually and collectively: (1) are identical to, similar to, or more restrictive than those under which persons accused or convicted of crimes are confined; (2) are ~~expressly intended to punish civil detainees; (3) are~~ not reasonably related to legitimate governmental objectives; and/or (4~~3~~) are excessive in relation to any proffered objective.

---

~~96~~**94** *Id.* at 2.

**166.** ~~187.~~ Detained Clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury.

## SECOND CLAIM FOR RELIEF

~~**Denial of the Right to a Full and Fair Custody Proceedings, in Violation of the Due Process Clause of the Fifth Amendment**~~
~~**(AIJ, FIRRP, IJC, ISLA, and RAICES on behalf of Detained Clients at the Four Detention Facilities)**~~

~~188. Plaintiffs reallege and incorporate by reference the foregoing paragraphs and incorporate them herein by this reference.~~

~~189. The Due Process Clause of the Fifth Amendment guarantees Detained Clients the right to a full and fair custody proceeding, such as a bond hearing or other proceeding related to release from detention.~~

~~190. Defendants' conduct creates a substantial likelihood that Detained Clients' right to a full and fair bond hearing or other custody proceeding will be violated because Defendants' policies and practices severely restrict Detained Clients' ability to access and communicate with Plaintiffs and Plaintiffs' ability to effectively represent Detained Clients.~~

~~191. Detained Clients have a substantial liberty interest in seeking release from detention, and avoiding prolonged detention.~~

~~192. All of the obstacles to accessing and communicating with counsel described herein create a substantial risk that wrongful outcomes, delayed relief, and other errors will occur in Detained Clients' custody proceedings. Eliminating these barriers would decrease the likelihood of the wrongful, erroneous, and unlawful deprivation of Detained Clients' liberty interest.~~

193. Any fiscal or administrative burden on the government by requiring Defendants to provide adequate access to counsel at the Four Detention Facilities is modest, especially in light of the countervailing interests of Detained Clients.

194. Detained Clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury.

### THIRD CLAIM FOR RELIEF

**Denial of the Right to Free Speech in Violation of the First Amendment**
**(AIJ, FIRRP, IJC, ISLA, and RAICES on behalf of themselves)**

195. Plaintiffs reallege and incorporate by reference the foregoing paragraphs and incorporate them herein by this reference.

196. The First Amendment protects Plaintiffs' activities as legal organizations in advising and representing their clients because those activities are modes of expression and association.

197. Defendants' policies, practices, and failure to act have interfered with and obstructed Plaintiffs' AIJ, FIRRP, ISLA, and RAISCE's ability to advise and represent Detained Clients and other detained people in need of legal assistance.

198. In the case of IJC, Defendants' policies, practices, and failures to act have interfered with and obstructed IJC's ability to ensure that their volunteer attorneys have access to Detained Clients.

199. Detained Clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury.

## FOURTH CLAIM FOR RELIEF

### Denial of the Right to Free Speech in Violation of the First Amendment
### (AIJ, FIRRP, IJC, ISLA and RAICES on behalf of Detained Clients at the Four Detention Facilities)

200. Plaintiffs reallege and incorporate by reference the foregoing paragraphs and incorporate them herein by this reference.

201. The First Amendment guarantees Detained Clients the right to communicate with the outside world.

202. The First Amendment also guarantees Detained Clients' right to hire and consult with an attorney. The government may not unreasonably restrict this right.

203. By depriving Detained Clients of the ability to hire, consult, and communicate with Plaintiffs, Defendants have violated and continue to violate Detained Clients' rights under the First Amendment.

204. Detained Clients also have a First Amendment right, grounded in the Free Speech Clause, to receive legal mail without government interference. This protection includes the right to send and receive mail, and the right to have legal mail inspected and opened in the Detained Client's presence. By preventing Detained Clients from receiving sealed legal mail without government interference, Defendants have violated and continue to violate Detained Clients' First Amendment rights to freedom of speech.

205. The First Amendment also guarantees Detained Clients the right to petition the government for redress of grievances, including the right to file other civil actions in court and the right to petition a federal agency for immigration benefits. Defendants have violated these rights by denying and restricting Detained Clients' access to calls, VTC calls, attorney-client visits, and other means of communication necessary for legal representation.

206. Detained Clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury.

**FIFTH CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (AIJ, FIRRP, IJC, ISLA, and RAICES on behalf of themselves and Detained Clients at the Four Detention Facilities)**

207. Plaintiffs reallege and incorporate by reference the foregoing paragraphs and incorporate them herein by this reference.

208. The APA, 5 U.S.C. § 551, *et seq.*, authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant strategy." 5 U.S.C. § 702.

209. ICE's Detention Standards are the primary mechanism through which Defendants purportedly endeavor to execute their duty to ensure adequate access to counsel for immigrants. These Detention Standards are ICE's own rules, which govern the conditions of confinement at ICE detention facilities. The Detention Standards apply at all ICE civil detention facilities, including the Four Detention Facilities

210. Defendants have failed to ensure compliance with them. Among other things, Defendants have (i) provided an inadequate number of private legal visitation rooms; (ii) deprived Detained Clients of confidential contact with Plaintiffs; (iii) deprived Detained Clients with limited English proficiency of access to interpreters during legal visits; (iv) deprived Detained Clients  and Plaintiffs of the ability to communicate on the telephone; (v) failed to provide free calls from Detained Clients to Plaintiffs; (vi) restricted the length of legal phone

113

calls; and/or (vii) prevented the timely and confidential exchange of documents between Detained Clients and Plaintiffs.

211. An agency's disregard for, or failure to follow its own rules constitutes "arbitrary, capricious" conduct in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

212. In addition, the agency's failure to comply with or enforce the attorney access requirements and Plaintiffs' and Detained Clients' constitutional rights is not "in accordance with law." 5 U.S.C. § 706(2)(B).

213. Further, the agency's failure to comply with its own Detention Standards constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

214. Defendants' final agency action, *i.e.*, their decision not to enforce their policies, as well as Defendants' failure to act, *i.e.*, their failure to enforce their policies, have caused Plaintiffs and Detained Clients at the Four Detention Facilities to suffer injuries in fact.

215. The interests that Plaintiffs seek to protect are within the zone of interests regulated by the applicable provisions of the Constitution and the 2008 PBNDS, 2011 PBNDS, and 2019 NDS.

216. Defendants' final agency action and failure to act are the direct cause of the injuries to Plaintiffs and Detained Clients.

217. Plaintiffs' requested relief would redress these injuries.

218. Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.

219. Detained Clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury.

### ~~SIXTH CLAIM FOR RELIEF~~

**Violation of Rehabilitation Act, 29 U.S.C. § 701** *et seq.*
**(FIRRP ~~and AIJ,~~ on behalf of ~~their disabled clients at Florence~~Detained Clients with**
**Disabilities)**

**167.** ~~220. Plaintiffs FIRRP and AIJ reallege and incorporate~~**Plaintiff realleges and**
**incorporates** by reference the foregoing paragraphs and incorporate them herein by this
reference.

**168.** ~~221.~~ Section 504 of the Rehabilitation Act provides, in relevant part, "No
otherwise qualified individual with a disability in the United States . . . shall, solely by reason of
her or his disability, be . . . denied the benefits of . . . any program or activity receiving Federal
financial assistance . . . ." 29 U.S.C. § 794(a). Section 504 applies to "individual[s] with a
disability." *See* 29 U.S.C. § 705(20)(B). The Supreme Court has framed this as an affirmative
obligation and has indicated that the relevant inquiry under the Rehabilitation Act for
determining if discrimination has occurred is whether meaningful access has been provided to
individuals with disabilities.

**169.** ~~222.~~ FIRRP's ~~and AIJ's~~ Detained Clients with Disabilities are covered by the
Rehabilitation Act. They have been found by a qualified mental health provider to have a serious
mental disorder or condition. These Detained Clients with Disabilities have physical or mental
impairments which substantially limit their life activity and make access to counsel to assist
them all the more critical. This finding by a qualified mental health provider also serves as a
record of such an impairment and indicates that they are regarded as having such an impairment.
They therefore meet the requirements for coverage under the Rehabilitation Act.

**170.** ~~223. FIRRP and AIJ's~~**FIRRP's** Detained Clients with Disabilities are being
excluded from participation in, or being denied benefits, services, programs, or other activities

for which a public entity is responsible. Defendants are federal government actors and provide access to counsel as a service or benefit to disabled individuals in detention. The Detention Standards and the Constitution require Defendants to provide access to this service. Detained Clients with Disabilities are qualified to participate in this benefit, as are all individuals in ICE detention.

**171.** ~~224.~~ Although there are barriers to access to counsel that apply to all detained individuals in Defendants' facilities, ~~FIRRP and AIJ's~~ **FIRRP's** Detained Clients with Disabilities are particularly affected by their ability to access counsel *because* of their disability. Defendants' constitutional obligation to provide adequate mental and health care to individuals in ICE detention facilities includes the subsidiary requirement that Defendants know which individuals in its custody have disabilities.

**172.** ~~225.~~ Defendants have unlawfully excluded Detained Clients with Disabilities from~~,~~ **and** denied them the benefit of **access to counsel**, and subjected them to discrimination on the basis of disability because certain barriers to counsel, as discussed *supra*, have specifically and especially affected Detained Clients with Disabilities at Florence ~~and Krome~~.

**173.** ~~226.~~ Detained Clients with Disabilities have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

**PRAYER FOR RELIEF**

WHEREFORE, ~~Plaintiffs~~**Plaintiff** respectfully request that the Court:

1.      Issue a judgment declaring that Defendants' policies, practices, and omissions described herein violate ~~Plaintiffs'~~**Plaintiff's** and their clients' rights under the

United States Constitution, ~~the Administrative Procedure Act,~~ and the Rehabilitation Act;

2.   Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting ~~Plaintiffs~~**Plaintiff** and Detained Clients to the unlawful acts and omissions described herein, and issue an injunction sufficient to remedy the violations of ~~Plaintiffs'~~**Plaintiff's** and Detained Clients' constitutional and statutory rights, including:

a.   An order that Defendants remove all barriers to communication between attorneys, their case-related personnel (including interpreters, notaries, experts, and social workers), and clients or prospective clients, and ensure the continual availability of effective attorney-client communication for persons in Defendants' custody;

b.   An order that Defendants provide for free, confidential in-person and virtual communication between attorneys, their case-related personnel, and clients or prospective clients by whatever means are reasonably available as of the time of this Complaint and by means available through future technology advances;

c.   An order that Defendants ensure timely, confidential, visits between attorneys, their case-related personnel, and clients or prospective clients, with access to telephone interpretation;

d.   An order that Defendants provide a sufficient number of private rooms for confidential visits between attorneys, their case-related personnel, and clients or prospective clients;

e.    An order that Defendants ensure that attorneys and their case-related personnel can meet with clients and prospective clients ~~in a timely manner and without restrictions of advance notice~~;

~~f. An order that Defendants ensure that attorneys and their case-related personnel can meet with clients and prospective clients;~~

**f.**    ~~g.~~ An order that Defendants provide private, unmonitored, unrecorded legal calls, with sufficient space and staffing;

~~h. An order that Defendants ensure that attorneys and their case-related personnel are able to leave voicemail messages for their clients and prospective clients which are timely communicated to the clients or prospective clients;~~

**g.**    ~~i.~~ An order that Defendants ensure that telephones are in good working order with adequate audio connection for attorney-client communication;

**h.**    ~~j.~~ An order that Defendants ensure that legal calls are not interrupted by disconnections or time limits;

**i.**    ~~k.~~ An order that Defendants provide free telephone access for clients and prospective clients to make calls to attorneys and their case-related personnel;

**j.**    ~~l.~~ An order that Defendants provide free, confidential VTC access for legal calls between attorneys or case-related personnel and clients or prospective clients;

**k.**    ~~m.~~ An order that Defendants implement an adequate process by which attorneys and their case-related personnel can schedule legal calls, VTC

calls, and visits with clients or prospective clients, including in excess of one hour;

**l.** ~~n.~~ An order that Defendants will make clients or prospective clients available to participate in scheduled legal calls, VTC calls, and visits, including in excess of one hour**, and where clients can directly communicate with Plaintiff to schedule legal telephone and VTC calls**;

**m.** ~~o.~~ An order that Defendants allow use of ~~laptops,~~ printers, cellular phones, and similar devices in waiting and attorney-visitation rooms;

~~p. An order that Defendants pre-approve interpreters in a timely manner;~~

**n.** ~~q.~~ An order that Defendants ensure timely delivery of legal mail;

**o.** ~~r.~~ An order that Defendants provide confidential fax and email systems, and any other similar technology, to allow timely exchange of legal communication, including legal documents;

**p.** ~~s.~~ An order that Defendants provide reasonable accommodations for Detained Clients with Disabilities ~~at Florence and Krome~~, including allowing attorneys and case-related personnel in-person legal visits in observation, medical, mental health, suicide, or segregation housing; providing facilitated, scheduled telephone and VTC legal calls; and providing personnel to manage attorney-access accommodation requests for Detained Clients with Disabilities.

3.    Award ~~Plaintiffs~~**Plaintiff** their reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law.

4.    Grant such other relief as the Court deems just and proper.

119

**Respectfully submitted this 11th day of August, 2023.**

~~Respectfully submitted this 18th day of November, 2022.~~

/s/ Eunice H. ~~Cho~~ **Cho**
Eunice H. Cho (DC Bar No. 1708073)
AMERICAN CIVIL LIBERTIES UNION
~~FOUNDATION~~**FOUNDATION**
NATIONAL PRISON ~~PROJECT~~ **PROJECT**
915 Fifteenth St. N.W., 7th ~~Floor~~**Floor**
Washington, DC ~~20005~~**20005**
(202) ~~548-6616~~**548-6616**
echo@aclu.~~org~~**org**

Kyle Virgien (CA Bar No. 278747)*~~*~~
AMERICAN CIVIL LIBERTIES UNION
~~FOUNDATION~~**FOUNDATION**
NATIONAL PRISON ~~PROJECT~~ **PROJECT**
39 Drumm St.
San Francisco, CA ~~94111~~**94111**
(202) ~~393-4930~~**393-4930**
kvirgien@aclu.~~org~~**org**

Jared G. Keenan (AZ Bar No. 027068)
Vanessa Pineda (AZ Bar No. 030996)
AMERICAN CIVIL LIBERTIES ~~UNION~~**UNION**
FOUNDATION OF ~~ARIZONA~~**ARIZONA**
P.O. Box ~~17148~~**17148**
Phoenix, AZ ~~85011~~**85011**
**(602) 650-1854**
~~(602) 650-1854~~
jkeenan@acluaz.~~org~~**org**
vpineda@acluaz.~~org~~**org**

Arthur B. Spitzer (DC Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
~~COLUMBIA~~**COLUMBIA**
915 Fifteenth St. NW, 2nd ~~Floor~~**Floor**
Washington, DC ~~20005~~**20005**
(202) ~~601-4266~~**601-4266**
aspitzer@acludc.~~org~~**org**

~~Katherine H. Blankenship (FL Bar No.~~

Katherine Melloy Goettel (IA Bar No. 23821)~~†~~*
Emma Winger (~~MA~~**DC** Bar No. ~~67760~~**90010721**)*
Suchita Mathur (NY Bar No. 5373162)*
AMERICAN IMMIGRATION ~~COUNCIL~~**COUNCIL**
1331 G St. N.W., Suite ~~200~~**200**
Washington, DC ~~20005~~**20005**
(202) ~~507-7552~~**507-7552**
kgoettel@immcouncil.~~org~~**org**
ewinger@immcouncil.~~org~~**org**
smathur@immcouncil.~~org~~**org**

**/s/ Linda Dakin-Grimm**
**Linda Dakin-Grimm (DC Bar No. 501954;**
**DDC Bar No. CA00176)**
**MILBANK LLP**
**2029 Century Park East, 33rd Floor**
**Los Angeles, CA 90067**
**(424) 386-4404**
**ldakin-grimm@milbank.com**

Stacey J. Rappaport (NY Bar No. 2820520)*
~~Linda Dakin-Grimm (DC Bar No. 501954)‡~~
Andrew Lichtenberg (NY Bar No. 4881090)*
Joseph Kammerman (NY Bar No. 5516711)*
MILBANK ~~LLP~~**LLP**
55 Hudson ~~Yards~~**Yards**
New York, NY ~~10001~~**10001**
(212) ~~530-5347~~**530-5347**
~~SRappaport~~**srappaport**@milbank.~~com~~**com**
~~LDakin-Grimm~~**alichtenberg**@milbank.~~com~~**com**
~~ALichtenberg~~**jkammerman**@milbank.~~com~~**com**

~~JKammerman@milbank.com~~
~~/s/ Danielle S. Lee~~
Danielle ~~S.~~ Lee **Sauer** (DC Bar No. 1659736)
MILBANK ~~LLP~~**LLP**

121

~~1031234)*~~
~~Daniel B. Tilley (FL Bar No. 102882)*~~
~~Janine M. Lopez (DC Bar No. 1685754)~~
~~AMERICAN CIVIL LIBERTIES UNION~~
~~FOUNDATION OF FLORIDA~~
~~4343 W. Flagler St. Suite 400~~
~~Miami, FL 33134~~
~~(786) 363-2700~~
~~kblankenship@aclufl.org~~
~~dtilley@aclufl.org~~
~~jlopez@aclufl.org~~
~~Amien Kacou (FL Bar No. 44302)*~~
~~AMERICAN CIVIL LIBERTIES UNION~~
~~FOUNDATION OF FLORIDA~~
~~4023 N. Armenia Avenue, Suite 450~~
~~Tampa, FL 33607~~
~~(813) 288-8390~~
~~akacou@aclufl.org~~

1850 K Street, NW, Suite ~~1100~~**1100**
Washington, DC ~~20006~~**20006**
(202) ~~835-7532~~**835-7532**
~~DLee~~**dlee**@milbank.~~com~~**com**

~~Adriana Piñon (TX Bar No. 24089768)*~~
~~Bernardo Rafael Cruz (TX Bar No. 4109774)*~~
~~Kathryn Huddleston (TX Bar No. 24038188)*~~
~~AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS~~
~~P.O. Box 8306~~
~~Houston, TX 77288~~
~~(713) 942-8146~~
~~apinon@aclutx.org~~
~~breruz@aclutx.org~~
~~khuddleston@aclutx.org~~

*Counsel for* ~~*Plaintiffs*~~ ***Plaintiff***
\*Admitted *pro hac* ~~*vice*~~ ***vice***
~~\*\*Application for admission *pro hac vice* forthcoming.~~
~~†Application for admission to the D.C. bar pending; motion for admission *pro hac vice* submitted with the Court.~~
~~‡Seeking admission to or renewal of membership in D.D.C.~~